[No. C023361. Third Dist. Apr. 22, 1997.]

KAISER FOUNDATION HOSPITALS, Plaintiff and Respondent, v.
S. KIMBERLY BELSHÉ, as Director, etc., Defendant and Appellant.

COUNSEL

Daniel E. Lungren, Attorney General, Charlton G. Holland III, Assistant Attorney General, Dennis Eckhart and Margarita Altamirano, Deputy Attorneys General, for Defendant and Appellant.

Hooper, Lundy & Bookman and Patric Hooper for Plaintiff and Respondent.

OPINION

SPARKS, Acting P. J.—In this appeal from a judgment granting a petition for writ of mandate, we consider the responsibilities of health care providers and the Department of Health Services (Department) for accurate reimbursement of Medi-Cal claims. (See Welf. & Inst. Code, § 14000 et seq. [all subsequent statutory references are to the Welfare and Institutions Code unless otherwise indicated].) We conclude the trial court erred in granting a writ of mandate to compel the Department to audit cost reports filed by

plaintiff Kaiser Foundation Hospitals (Kaiser). We shall therefore reverse the judgment.

## STATUTORY AND REGULATORY FRAMEWORK

To place the issues of this appeal in their proper context, we first outline the statutory and regulatory framework of the Medi-Cal program.

As the California Supreme Court recently described in *Robert F. Kennedy Medical Center* v. *Belshé* (1996) 13 Cal.4th 748 [55 Cal.Rptr.2d 107, 919 P.2d 721]: "The Medi-Cal program (§ 14000 et seq.) represents California's implementation of the federal Medicaid program (42 U.S.C. §§ 1396-1396v), through which the federal government provides financial assistance to states so that they may furnish medical care to qualified indigent persons. [Citation.] The Department is the single state agency designated to administer the Medi-Cal program. (§ 14203.)

"When originally enacted in 1965, the Medicaid Act required states to reimburse health care providers for the 'reasonable cost' of hospital services rendered; the term 'reasonable cost' was defined under federal standards to correspond to the cost of services *actually* incurred by a hospital provider and otherwise allowable under Medicare. [Citations.] In accordance with these federal standards, former section 14105 (the predecessor to section 14170), as originally enacted, provided for hospital reimbursement on the basis of 'reasonable costs for . . . services.' [Citation.] The statute, however, did not contain any provision for an audit of a provider's expenditures under the Medi-Cal program.

"In 1969, former section 14105 was amended to include, among other provisions, the following language: 'Cost reports and other data submitted by providers to a state agency for the purpose of determining reasonable costs for services or establishing rates of payment shall be considered true and correct unless audited within eighteen (18) months after July 1, 1969, the close of the period covered by the report, or after the date of submission of the original or amended report by the provider, whichever is later.' [Citation.] In 1973, section 14105 was amended again to extend the 18-month period governing the auditing process to 3 years. [Citation.] In 1977, the pertinent provisions of section 14105 were recodified as section 14170 . . . ."[1]

"In 1980 and 1981, in an effort to contain spiraling Medicaid costs for hospital services, Congress amended the Medicaid standard for hospital

---

[1]As discussed in detail later in our opinion, section 14170, subdivision (a)(1), provides in relevant part: "Amounts paid for services provided to Medi-Cal beneficiaries shall be audited by the [D]epartment in the manner and form prescribed by the [D]epartment. The

reimbursement, replacing the 'reasonable cost' standard with the current standard requiring states to reimburse hospital providers at rates that are 'reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities . . . .' [Citations.] Under this new standard, states were permitted to develop alternate methodologies to limit reimbursement based upon the costs that would have been incurred by an efficient and economically operated facility, even if a provider's actual costs were greater. [Citation.]

"In response to this change in Medicaid standards, the Department promulgated regulations imposing additional limits on the reimbursement available to a provider. The first, embodied in title 22 of the [California Code of Regulations], section 51536 (enacted July 1, 1980), establishes a maximum reimbursement limit for hospital inpatient services, constituting the lesser of (1) customary charges, (2) allowable costs determined in accordance with applicable Medicare standards and principles of reimbursement, and (3) the 'all-inclusive rate per discharge.' The 'all-inclusive rate per discharge' established by section 51536 determines the maximum allowable average cost per Medi-Cal patient that is reimbursable [pursuant to specified formulae and allowances]. . . . This rate, when multiplied by the number of Medi-Cal patients treated, establishes an upper limit on the total reimbursement available to the provider. [Citation.]

"The Department also promulgated [California Code of Regulations], title 22, section 51539 (issued November 1, 1982), which established a 'peer group' limit prohibiting reimbursement at a rate per patient greater than the 60th percentile of the rate per discharge of the provider's 'peer group,' established according to factors such as the size of the facility and the types of patients served. [Citation.]

"Under this methodology limiting total reimbursement, the Department retained the existing reasonable cost standard (in the form of the lesser of customary charges and allowable costs), while engrafting onto the existing standard new limitations on reimbursement—the all-inclusive rate per discharge and the peer group limit—restricting reimbursement to those costs that would have been incurred by an efficient and economically operated facility.

[D]epartment shall maintain adequate controls to ensure responsibility and accountability for the expenditure of federal and state funds. . . . [T]he cost reports and other data for cost reporting periods beginning on January 1, 1972, and thereafter shall be considered true and correct unless audited or reviewed within three years after the close of the period covered by the report, or after the date of submission of the original or amended report by the provider, whichever is later."

"In order to furnish hospitals with a cash flow sufficient to provide Medi-Cal services during a particular fiscal year, the Department is authorized to make interim payments based upon the hospital provider's historical rates of Medi-Cal reimbursement for costs. (Cal. Code Regs., tit. 22, § 51536, subd. (c)(2).) At the close of the year, the provider submits its cost reports to the Department, setting forth the provider's actual costs for covered services that in the provider's view are allowable under Medi-Cal. [Citations.] Based upon the unaudited cost report data, the Department makes a 'tentative settlement,' reconciling the amount of interim payments with the reported unaudited costs. (Cal. Code Regs., tit. 22, § 51536, subd. (b)(9).) Thereafter, following completion of the audit process, the Department issues a final audit report and settlement, determining among other items the provider's allowable costs as established by the Department, and reconciling the difference, if any, between the tentative settlement and the final audit settlement.

"The Department then undertakes the calculations necessary to determine a final reimbursement settlement of Medi-Cal liabilities based upon the maximum inpatient reimbursement limit, incorporating the all-inclusive rate per discharge and the peer group limit, and utilizing the audited cost data as well as information from other sources. In this final settlement, the Department reconciles the amount of interim payments made, with the maximum amount reimbursable under the regulations.

"At the time of the final settlement, the hospital provider already has received interim payments corresponding to its historical rates of reimbursement for costs, as well as payments pursuant to the tentative and final audit settlements, if warranted. The Department must determine whether these payments exceed the additional limits imposed by the all-inclusive rate per discharge and the peer group limit. Because the total reimbursement liability, as limited under California Code of Regulations, title 22, sections 51536 and 51539, generally will not exceed the amount of interim payments, usually the most favorable final settlement that may be obtained by a provider is a determination that the Department is not entitled to recoup any moneys previously paid to the provider." (*Robert F. Kennedy Medical Center* v. *Belshé, supra*, 13 Cal.4th at pp. 751-754, italics in original, fns. omitted; see also *County of San Joaquin* v. *Belshé* (1995) 35 Cal.App.4th 6, 8-11 [41 Cal.Rptr.2d 267].)

In filing a cost report for reimbursement, a provider's chief executive officer must certify that the report is true and correct. (§ 14107.4, subd. (c).) Reimbursement claims are handled by Electronic Data Systems (EDS), a claims processing company under contract with the Department. As each

claim is processed, EDS sends a remittance advice, detailing the purpose for the payment and the number of Medi-Cal patient days. EDS also prepares a paid claims summary report (PCSR) which is a cumulative record of the claims paid. A provider can obtain a copy of the PCSR at any time.

With this framework in mind, we turn to the facts of this case.

### FACTUAL AND PROCEDURAL BACKGROUND

At issue in this appeal are cost reports filed for nine of Kaiser's hospitals for the fiscal year ending December 31, 1990.[2] Letters from the Department about each hospital notified Kaiser that its cost reports had been postmarked on April 24, 1991, thus beginning the three-year audit period described under section 14170.[3] Each letter, sent at a different time, outlined the tentative settlement for the fiscal year and gave Kaiser a telephone number to call with any questions. Subsequent letters, most of which were sent in May 1992, outlined the final settlement. Kaiser did not respond to the Department's letters during the time between the filing of the cost reports in April 1991 and receiving the final settlement letters more than one year later.

The letters from the Department regarding the cost reports filed by each hospital differ in significant respects, and we therefore outline each individually.

*Anaheim Hospital*: On May 22, 1991, the Department wrote Kaiser that it had received Anaheim's Medi-Cal cost report. The letter continued: "In addition, we have completed the preaudit analysis of the cost report. Our review indicates that interim payments may have been substantially understated. Therefore, a $-0- tentative cost settlement will be made at this time pending audit of the cost report. The audit will be conducted at a later date when a final cost settlement will be issued." The letter referred Kaiser to a Department employee to answer any questions Kaiser might have.

Nearly one year later, on May 15, 1992, the Department notified Kaiser that it had reviewed the hospital's Medi-Cal cost report pursuant to section 14170, and noted its review "was limited to a review of the cost report." The letter continued: "The settlement presented on the accompanying [schedule]

---

[2] Our review is circumscribed by the record before us, which contains neither the cost reports themselves, nor any evidence of unreimbursed claims.

[3] Section 14170, subdivision (a)(1), provides in relevant part: "[T]he cost reports and other data for cost reporting periods beginning on January 1, 1972, and thereafter shall be considered true and correct unless audited or reviewed within three years after the close of the period covered by the report, or after the date of submission of the original or amended report by the provider, whichever is later."

in the amount of $53,279 represents the reported amount due the Hospital for the above fiscal period which was accepted as filed." In other words, the Department settled the account for the amount Kaiser had reported as owing.

*Fontana Hospital*: On July 12, 1991, the Department wrote a letter to Kaiser regarding the Fontana cost report similar to that written about Anaheim Hospital. The Department noted: "Our review indicates that interim payments may have been substantially understated. Therefore, a $-0- tentative cost settlement will be made at this time pending audit of the cost report. The audit will be conducted at a later date when a final cost settlement will be issued." The letter gave a contact number to call if Kaiser had any questions.

On May 15, 1992, the Department notified Kaiser that it had completed its review under section 14170, which "was limited to a review of the cost report." The Department concluded: "The settlement presented [in the accompanying schedule] in the amount of $288,138 represents the reported amount due the Hospital for the above fiscal period which was accepted as filed."

*Sunset Hospital*: On July 12, 1991, the Department informed Kaiser that its cost report had been received. The letter continued: "[W]e have completed the preaudit analysis of the cost report. A tentative settlement will be made in the amount of $7,643 due the hospital based upon the reported settlement." Again, a contact phone number was given.

On May 15, 1992, the Department notified Kaiser that its review "was limited to a review of the cost report," and that the settlement of $7,643 outlined on an accompanying schedule "represent[ed] the reported amount due the Hospital for the above fiscal period which was accepted as filed."

*Panorama City Hospital*: On July 17, 1991, the Department informed Kaiser that it had received the Panorama City cost report. The letter stated: "A review of the fiscal intermediary's Medi-Cal Paid Claims Summary Report (PCSR), rundate July 16, 1991, indicates that Medi-Cal days interim payments have been understated on the cost report. Therefore, a tentative settlement in the amount of $34,290 due to the hospital based on a reconciliation of the cost report to the PCSR . . . will be issued at this time . . . ." Any questions were to be referred to a specified Department employee.

On May 15, 1992, the Department notified Kaiser that it had completed its review under section 14170, which was "limited to a review of the cost

report," and had accepted the cost report as filed, resulting in a settlement of $68,589 due to the hospital. This was the amount Kaiser had indicated as owing on its cost report.

*West Los Angeles Hospital*: On July 31, 1991, the Department sent Kaiser a letter regarding the West Los Angeles Hospital cost report similar to that sent to Panorama City. After noting it had received the cost report, the Department wrote: "In addition, we have completed the preaudit analysis of the cost report. A review of the fiscal intermediary's Medi-Cal Paid Claims Summary Report (PCSR), run date July 16, 1991, indicates that Medi-Cal days and interim payments have been understated on the cost report. Therefore, a tentative settlement in the amount of $18,723 due the hospital based on a reconciliation of the PCSR (copy enclosed) will be issued at this time. . . . Our audit of the cost report will be conducted at a later date, when a final cost settlement will be issued." The letter indicated any questions should be referred to a Departmental employee.

On May 15, 1992, the Department informed Kaiser that it had completed its review of the West Los Angeles cost report and concluded: "The settlement presented on the accompanying [schedule] in the amount of $63,830 represents the reported amount due the Hospital for the above fiscal period which was accepted as filed."

*Woodland Hills Hospital*: On August 1, 1991, the Department notified Kaiser that it had received the Woodland Hills cost report. The letter continued: "In addition, we have completed the preaudit analysis of the cost report. A tentative settlement will be made in the amount of $11,234 due the State. The settlement is based upon a reconciliation of the Paid Claims Summary Report . . . and the Paid Claims Detail Report. . . . Copies of these reports are enclosed for your information." Again, a telephone number was given for any questions.

On May 15, 1992, the Department informed Kaiser that it had reviewed the cost report and concluded: "The settlement presented on the accompanying [schedule] in the amount of $9,820 represents the reported amount due the Hospital for the above fiscal period which was accepted as filed."

*Harbor City Hospital*: On September 11, 1991, the Department notified Kaiser that the Harbor City cost report had been received. The letter stated: "Our preliminary examination of the cost report reveals that no Medi-Cal participation has been reported. However, the Medi-Cal Paid Claims Summary and Detail Reports . . . indicate that 202 Medi-Cal patient days were billed and paid during the cost report period. Copies of these reports are

enclosed. [¶] Therefore, a $-0- tentative settlement will be issued at this time pending our audit of the cost report. The audit will be conducted at a later date at which time a final cost settlement will be issued." A phone number was given for any questions Kaiser might have.

Although not included in the record, the parties indicate the final Harbor City settlement reflected the PCSR figures.

*Riverside Hospital*: On September 12, 1991, the Department notified Kaiser that the Riverside cost report had been received. The letter stated: "Our preliminary examination of the cost report reveals that no Medi-Cal participation has been reported, although Electronic Data Systems Paid Claims Summary and Detail Reports . . . indicate that 83 Medi-Cal patient days were billed and paid during the cost report period. Copies of these reports are enclosed." The letter concluded: "Therefore, a $-0- tentative settlement will be issued at this time pending our audit of the cost report. The audit will be conducted at a later date at which time a final cost settlement will be issued." Any questions were to be directed to a specified Department employee.

On August 28, 1992, the Department wrote to Kaiser stating: "We have reviewed [Riverside's] Medi-Cal cost report for the . . . fiscal period [ending December 31, 1990]. Our review was made under the authority of Section 14170 of the Welfare and Institutions Code and was limited to a review of the cost report. [¶] The cost report was accepted as filed."

*Bellflower Hospital*: On November 7, 1991, the Department notified Kaiser that the Bellflower cost report had been received. The letter stated: "[W]e have completed the preaudit analysis of the cost report. A tentative settlement will be made in the amount of $52,870 due the hospital based upon the reported settlement." The Department provided a telephone number for any questions.

On May 15, 1992, the Department informed Kaiser that its review was completed and had been "limited to a review of the cost report." The letter concluded: "The settlement presented on the accompanying [schedule] in the amount of $52,870 represents the reported amount due the Hospital for the above fiscal period which was accepted as filed."

Despite being informed of the potential problems with its costs reports, being given copies of the PCSR's, and being given a telephone number and contact person for any questions, Kaiser did not contact the Department or otherwise challenge the Department's preliminary assessments while the

cost report reviews were pending. Instead, on May 28, 1992, two weeks after receiving most of the final settlement letters, Kaiser wrote to the Department seeking to amend the cost reports "to reflect claims not included at time of filing. A limited comparison to the Paid Claims Summary indicates a significant difference between the filed cost reports and the number of claims actually paid."

The Department denied this request, noting that under section 51019 of title 22 of the California Code of Regulations, "the Department may accept an amended cost report for the fiscal period for which appeal proceedings are pending." Since no appeal was pending, amended cost reports could not be filed.[4]

Kaiser sent the Department a letter seeking a "Show Cause Hearing" to settle the cost reports. Kaiser claimed that several Medi-Cal claims were billed and paid after the due date of the Medi-Cal cost report.

The matter was submitted to the administrative law judge (ALJ) on the basis of written declarations and briefs. Kaiser asserted it had been deprived of more than $300,000 in reimbursement costs, and that the Department had intentionally issued final settlements based on statistics known to be false. Kaiser stated that in previous years, the Department's auditors had corrected utilization statistics during the settlement process but did not do so in this case. To correct these errors, Kaiser sought to submit amended cost reports for the fiscal year ending December 31, 1990. Alternatively, Kaiser asked that the original cost reports be reopened to correct the number of Medi-Cal patient days it had provided.

The Department countered that because a final settlement had issued and Kaiser did not have an appeal pending, it could not file amended cost reports. The Department also noted that Kaiser had not made a timely request for a hearing on any disputed audit findings.

In a proposed decision, the ALJ denied Kaiser's request to file amended cost reports. The ALJ concluded that because the tendered issue did not involve a disputed audit finding that resulted in an adjustment to Kaiser's

---

[4]A provider can request a hearing to examine disputed audit findings which result in an adjustment to Medi-Cal reimbursement. (Cal. Code Regs., tit. 22, § 51017; see also *Coastal Community Hospital* v. *Belshé* (1996) 45 Cal.App.4th 391, 394-395 [52 Cal.Rptr.2d 659].) Here, because there was no adjustment to the amount claimed by Kaiser, Kaiser was not aggrieved. It therefore could not—and did not—request such a hearing.

As we discuss below, amended cost reports must be filed before the cost report determination is finally settled. (Cal. Code Regs., tit. 22, § 51019, subd. (a); *Mission Community Hospital* v. *Kizer* (1993) 13 Cal.App.4th 1683, 1690-1693 [17 Cal.Rptr.2d 303].)

cost reports, there was no jurisdiction to consider Kaiser's claim. The ALJ devoted several pages of his proposed decision to discussing amended cost reports and suggesting the Department's interpretation was incorrect, but he ultimately concluded the matter was not properly before the administrative tribunal.

The Department adopted the proposed decision, but in a somewhat puzzling statement added that, while it agreed with the result reached, it disagreed with the ALJ's "reasoning and analysis. However, the task of either remanding or issuing an alternative decision incorporating a proper analysis and reasoning in this case is both time and cost prohibitive."

In June 1994, Kaiser filed a petition for writ of mandate and declaratory relief, citing Code of Civil Procedure sections 1085 and 1094.5.[5] Kaiser again asserted the Department knowingly issued final settlements based on inaccurate data, and asked that the court issue a peremptory writ under Code of Civil Procedure section 1094.5 to set aside the Department's reimbursement and direct recalculation of settlement figures using correct statistics.

Points and authorities filed more than one year later made no reference to Code of Civil Procedure section 1094.5 and instead asked for relief under Code of Civil Procedure section 1085, asserting the Department had an obligation to audit and correct the data Kaiser had submitted. Kaiser argued the Department's failure to conduct such an audit violated section 14170. Kaiser asserted the question of amended cost reports was irrelevant, as the Department had a duty to audit the cost reports and reconcile them with the PCSR's.

The Department countered that the precise scope of any audit conducted was left to the Department's discretion under section 14170. The Department also noted that Kaiser was familiar with the Department's various auditing procedures, including the "accepted as filed" option. For the fiscal years ending December 31, 1984, through December 31, 1989, 26 of Kaiser's cost reports had been accepted as filed, 18 were adjusted using PCSR's, and 3 others were adjusted for other reasons. The Department further noted that Kaiser could have obtained the PCSR's containing the most up-to-date reimbursement statistics simply by requesting them, enabling them to file amended cost reports if necessary.

At the hearing, discussion focused on whose burden it was to ensure proper reimbursement. Kaiser asserted that because the Department had

---

[5]In its petition, Kaiser named S. Kimberly Belshé, the Director of the Department, as respondent. For convenience, we refer to the Department as the respondent.

PCSR's with up-to-date statistics, it was obligated to reconcile the submitted cost reports with those figures. The Department countered that the same information was readily available to Kaiser, and the hospitals should have filed amended cost reports while the settlements were pending.

The trial court concluded Kaiser was justified in not filing amended cost reports because the Department had represented in its correspondence that audits would be conducted. The court further held that accepting the reports as filed did not constitute a sufficient audit. The court issued a writ of mandate compelling the Department "to audit the 1990 Medi-Cal cost reports of the hospitals at issue to the extent it is necessary for the [Department] to reconcile the Medi-Cal patient days and Medi-Cal charges and other relevant statistics with the patient days, charges, and other statistics contained in the most recently issued paid claims summary reports for each hospital's 1990 cost report, and to recalculate the Medi-Cal payment owing each hospital by using the reconciled figures."

This appeal by the Department followed.

### DISCUSSION

The Department contends the trial court erred in issuing a writ of mandate because the type of audit conducted on claims reports was a matter left to the Department to determine. We agree.

Initially, we note that for purposes of this appeal, it makes no difference whether the issued writ was one for traditional mandamus under Code of Civil Procedure section 1085, or administrative mandamus under Code of Civil Procedure section 1094.5. Both types of mandamus are subject to the same principles, requirements, and "panoply of rules." (*Woods* v. *Superior Court* (1981) 28 Cal.3d 668, 673-674 [170 Cal.Rptr. 484, 620 P.2d 1032].) Thus, mandate will lie only if there is (1) a clear and present duty on the part of the respondent and (2) a clear, present and beneficial right in the petitioner to the performance of that duty. (*Hutchinson* v. *City of Sacramento* (1993) 17 Cal.App.4th 791, 796 [21 Cal.Rptr.2d 779]; see also *Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 731-732 [248 Cal.Rptr. 115, 755 P.2d 299].) A writ cannot be used to control a matter of discretion. (*Hutchinson* v. *City of Sacramento, supra*, 17 Cal.App.4th at p. 796.)

Section 14170, subdivision (a)(1), provides: "Amounts paid for services provided to Medi-Cal beneficiaries shall be audited by the [D]epartment *in the manner and form prescribed by the [D]epartment*." (Italics added.) Section 14170 does not prescribe a particular form required for an audit. Instead, the scope of an audit is a matter left to the Department's discretion.

Audits may take a range of forms. As materials submitted by both parties note: "The scope of the annual audit of a provider's costs will normally be in the form of (1) a desk review by the intermediary; (2) a limited-scope audit in which only specifically identifiable areas are examined; or (3) a full-scope audit which involves a complete examination of a provider's records and on-site inspections of the provider's plant and equipment, etc." (2 Medicare & Medicaid Guide (CCH), Provider Audits, ¶ [7980], p. 2901.) With more than 2,000 providers submitting cost reports, the Department does not have enough resources to conduct a comprehensive audit of each Medi-Cal provider. In some cases, an audit may consist of a desk review and acceptance of the cost report as filed. Many of Kaiser's previous cost reports were handled in this fashion, and similar treatment of cost reports is noted in other cases. (E.g., *Coastal Community Hospital* v. *Belshé, supra*, 45 Cal.App.4th at pp. 393-394; *Mission Community Hospital* v. *Kizer, supra*, 13 Cal.App.4th at p. 1686.) In other situations, a more comprehensive audit may be required. It is left to the Department to determine the scope of audit required in any particular case.

It is unclear from the record before us exactly what type of review is conducted when a report is accepted as filed. While Kaiser contends no review at all occurs, that is clearly not the case. For example, in several of its letters, the Department notified Kaiser that the cost report had understated interim payments; some review must have been done to reach that determination. At the hearing on Kaiser's writ petition, the Department asserted that before accepting the cost reports as filed, it in fact reviews the cost report, as it indicated in its letters to Kaiser.

However, the precise nature of the review or audit done is immaterial because, as we have already noted, the scope of the audit is a matter expressly left to the Department's discretion under section 14170. A review-type audit is clearly contemplated by section 14170, which mentions both audits and reviews.

A decision to accept a cost report as filed has consequences for both the Department and the provider. Pursuant to section 14170, if the Department does not audit the cost report within three years, the figures provided in that report must be accepted as true and used in the calculation to determine the proper amount of reimbursement.[6] There are also consequences to the provider if the cost report is accepted as filed. If the reimbursement amount

---

[6]While the Department must raise any challenge to the accuracy of the provider's cost report within three years, the final reimbursement figure may be determined after that period of time. (*Robert F. Kennedy Medical Center* v. *Belshé, supra*, 13 Cal.4th at pp. 755-760.) That is because the cost report data "constitutes only a portion of the information necessary for the final determination of the provider's Medi-Cal reimbursement." (*Id.* at p. 757.) Other

matches that claimed by the provider, the provider is not aggrieved and is precluded from filing an appeal. As title 22, section 51017 of the California Code of Regulations provides, an appeal can be taken only from an adjustment to a reimbursement claim. A claim that is accepted as filed is not adjusted, and therefore no appeal will lie. The requirement that a provider file a true and correct cost report is therefore of great importance: a provider who files an incomplete or inaccurate report runs the risk of losing reimbursement to which it is entitled.

A provider can, however, file an amended cost report any time before the final settlement of a claim, i.e., up until any appeal is resolved. (Cal. Code Regs., tit. 22, § 51019, subd. (a); *Mission Community Hospital* v. *Kizer, supra*, 13 Cal.App.4th at pp. 1690-1693.)[7] Here, Kaiser could have filed amended cost reports to include any additional Medi-Cal expenses incurred during the 1990 fiscal year anytime from April 1991, when the cost reports were first filed, until the date the Department notified Kaiser that its cost reports would be accepted as filed. That date was in May 1992 in seven cases, in August 1992 in one instance, and in January 1993 in another.

Although Kaiser was notified of potential discrepancies and received copies of the PCSR's, it did not file amended cost reports. Kaiser claims it did not do so because it relied on the Department's assertion that it would conduct an audit to verify the appropriate reimbursement amount.[8] However, not all of the letters to Kaiser included such a representation. Of the nine claims involved, mention of an upcoming audit was made in only five instances. Thus, Kaiser had no basis for expecting a more extensive audit in any of the remaining cases.

Moreover, it was unreasonable for Kaiser to rely in this fashion. While Kaiser might arguably have been on notice that the Department intended to *reduce* the claimed reimbursement amount because of understated interim payment amounts, there was no suggestion whatsoever that the Department intended to *increase* the reimbursement beyond that claimed in the cost

elements of the calculation include figures such as the peer group limits and the all-inclusive rate per discharge, as discussed earlier.

[7]Section 51019, subdivision (a), of title 22 of the California Code of Regulations provides that an amended cost reports may be filed "for the fiscal period or periods for which proceedings are pending under this article," i.e., article 1.5, "Provider Audit Appeals." Amended reports may clearly be filed before that time as well, as courts have recognized. (See, e.g., *Mission Community Hospital* v. *Kizer, supra*, 13 Cal.App.4th at pp. 1690-1693.) The amended report must simply be filed before the case is finally settled. A pending appeal marks the outside limit for filing such a report.

[8]The Department asserts that in finding this reliance reasonable, the trial court essentially applied principles of equitable estoppel, even though that theory was not pleaded by Kaiser in its writ petition. Given our resolution of this matter, we do not discuss its characterization further.

report. Upon being notified that there were discrepancies between the cost reports and the Department's own records, and upon realizing it had additional claims that had not been included in its original cost reports, Kaiser should have filed amended cost reports. It did not seek to do so until after the deadline for filing such reports had passed.[9]

Kaiser was reimbursed for precisely the amount it had claimed as due. Under these circumstances, Kaiser has no complaint. (*Coastal Community Hospital* v. *Belshé, supra*, 45 Cal.App.4th at p. 395.)

We further note that the court's writ required the Department to audit the cost reports of nine hospitals and reconcile them with the PCSR's. However, according to Kaiser, that had already been done with the Harbor City Hospital. There was therefore no reason to include this hospital in the court's order.

In short, a provider is statutorily required to submit true and correct cost reports to the Department. (§ 14107.4, subd. (c).) In order to ensure that this requirement is met, a provider also has the obligation to provide amended cost reports in a timely fashion if the initial reports are incorrect. To hold otherwise would permit providers to file incomplete and/or erroneous cost reports and rely on the Department to correct these errors and provide the proper amount of reimbursement, a result at odds with the clear intent of section 14107.4, subdivision (c). Kaiser had more than one year in which to file amended cost reports to include any additional reimbursable costs. It did not do so. Any fault lies with the provider, not the Department.

## DISPOSITION

The judgment is reversed and the cause remanded to the trial court with directions to enter a new and different order denying Kaiser's petition for writ of mandate. The Department is awarded costs on appeal.

Nicholson, J., and Morrison, J., concurred.

---

[9]Kaiser argued below that it was caught in a Catch-22 situation because the Department advised it could neither appeal the Department's decision, nor file an amended report. This situation was of Kaiser's own making. By May 1992, all reimbursable costs were known and could have been claimed. (See Cal. Code Regs., tit. 22, §§ 51008, 51008.5, subd. (a).) Kaiser had from December 1990 until May 1992 to file amended cost reports but failed to do so.