[No. C043540. Third Dist. Feb. 18, 2004.]

REDDING MEDICAL CENTER, Plaintiff and Appellant, v.
DIANA M. BONTA´, as Director, etc., Defendant and Respondent.

## Counsel

Hooper, Lundy & Bookman and Patric Hooper for Plaintiff and Appellant.

Bill Lockyer, Attorney General, James M. Humes, Assistant Attorney General, Frank S. Furtek and Paul Reynaga, Deputy Attorneys General, for Defendant and Respondent.

## Opinion

**DAVIS, J.—** ■ Under the Medi-Cal health care program, a health care provider can be reimbursed annually for depreciation on buildings and equipment that are used to provide services to Medi-Cal patients. Under applicable regulations, the depreciation is based on the historical cost of the asset, which is generally the provider's cost of acquiring and significantly improving it. The provider sets forth these figures in yearly cost reports that may be audited.

The Medi-Cal health care provider here, Redding Medical Center (Redding), made current claims for depreciation reimbursement, which the Department of Health Services (DHS) timely audited. Redding maintained

that DHS was foreclosed from requiring Redding to submit documentation of the historical costs of the claimed depreciable assets if those costs had been previously reported in a cost report that was considered true and correct under Welfare and Institutions Code section 14170 because it was not audited or reviewed within three years of the close of the period covered by the report or, if later, of the date of its submission.

█ We disagree with Redding. If a health care provider continues to claim depreciation, it must stand ready to document the historical cost underlying the current claim. This is particularly true where, as here, the health care provider during the audit has submitted evidence showing that it has made depreciation changes over time, including changes in historical costs. Consequently, we affirm the judgment that denied Redding's petition for administrative mandate.

## BACKGROUND

California implements the federal Medicaid program through its Medi-Cal program. (Welf. & Inst. Code, § 14000 et seq.; 42 U.S.C. § 1396 et seq.)[1] Medi-Cal provides medical care to indigent persons. DHS administers the Medi-Cal program. (§ 14203.) Redding provides hospital services to Medi-Cal patients. (See *Redding Medical Center v. Bonta´* (1999) 75 Cal.App.4th 478, 480 [89 Cal.Rptr.2d 348] *(Bonta´).)*

DHS is required to reimburse Medi-Cal providers of hospital services for their Medi-Cal costs. (§ 14170; Cal. Code Regs., tit. 22, § 51536.) DHS does so by making interim payments during a fiscal year that are later reconciled with a "final settlement" of a fiscal year cost report. *(Bonta´, supra,* 75 Cal.App.4th at p. 480.) Hospitals such as Redding are to be reimbursed for their "[a]llowable costs determined in accordance with applicable *Medicare* standards and principles of reimbursement." (Cal. Code Regs., tit. 22, § 51536, subd. (a)(2), italics added; *Bonta´, supra,* 75 Cal.App.4th at p. 480; *Mission Community Hospital v. Kizer* (1993) 13 Cal.App.4th 1683, 1689 [17 Cal.Rptr.2d 303] [California has chosen to incorporate certain Medicare statutes and regulations into its Medi-Cal regulatory scheme].)

Pursuant to these reimbursement standards and principles, Redding may claim reimbursement for capital-related costs, including depreciation costs. (42 C.F.R. § 413.130(a)(1) (2002).) Reimbursable depreciation costs include "[a]n appropriate allowance for depreciation on buildings and equipment used in the provision of patient care." (42 C.F.R. § 413.134(a).) The allowable depreciation must be "[b]ased on the historical cost of the asset" and its

---

[1] Future undesignated section references are to the Welfare and Institutions Code.

"estimated useful life." (42 C.F.R. § 413.134(a)(2) & (a)(3).) Generally, "[h]istorical cost is the cost incurred by the present owner in acquiring the asset"; it also includes the costs of significantly bettering or improving the asset. (42 C.F.R. § 413.134(b)(1)(ii)(D).) For example, if a provider acquired a hospital building in 1972 for $3,000,000 with an estimated useful life of 30 years (and had not significantly improved it), the annual allowable depreciation cost for the building would be $100,000, i.e., $3,000,000 divided by 30; if, then, 20 percent of the patients treated at the hospital during a particular fiscal year were Medi-Cal patients, Medi-Cal's reimbursement obligation for that fiscal year's depreciation cost on the building would be $20,000, i.e., 20 percent of $100,000.

This case arose after DHS timely audited Redding's Medi-Cal cost reports for the 1996 and 1997 fiscal years. In those reports, Redding claimed annual depreciation reimbursement for a variety of buildings and equipment. Most of these assets had been acquired prior to the two fiscal years at issue, and two of the assets had been acquired as early as 1972. (Depreciation on assets acquired during the 1996 and 1997 fiscal years is not at issue.)

During the audit, Redding submitted a "lapsing schedule" to DHS. This schedule showed that, based on past Medicare audits, Redding had made adjustments to historical costs of assets on which Redding claimed continuing depreciation in the 1996 and 1997 fiscal years. Redding explained the "lapsing schedule" to the DHS auditor as follows: "A Medicare lapsing schedule was prepared to incorporate the Medicare audit adjustments on fixed assets additions and disposal. The most common audit adjustments made by the Medicare auditors were additions disallowed due to lack of invoices, difference in historical cost between the books and the invoices, incorrect assignment of assets' estimated useful lives and assets disallowed due to non existence [*sic*] of assets during physical inspection." During the administrative hearing in this matter, the DHS auditor testified that the lapsing schedule indicated there were differences in the reporting of historical costs for purposes of cost reporting and purposes of financial reporting.

The lapsing schedule prompted DHS to test the accuracy of the historical costs portion of Redding's depreciation schedules for the two fiscal years at issue, 1996 and 1997. DHS did this by selecting certain higher-cost assets from the depreciation schedules and asking Redding to document their reported historical cost.

Redding largely balked at providing the documentation of these historical costs. Redding staked its ground on the concept of administrative finality it saw embodied in section 14170. That section gives DHS three years to audit a cost report that covers a particular cost reporting period, after which the

information contained therein is deemed true and correct. (§ 14170, subd. (a)(1).) Redding argued that since depreciation costs had been previously allowed on the assets at issue in finalized cost reports, that was the end of the matter—those particular historical costs and depreciation amounts had been finally settled for all future cost reports. (The administrative law judge had noted that the historical costs of assets listed on Redding's depreciation schedules had never actually been audited.)

DHS disagreed with Redding's point about finality, and disallowed depreciation reimbursement on the tested assets for the 1996 and 1997 fiscal years based on the lack of documentation. DHS's decision significantly reduced Redding's claimed depreciation for these two fiscal years.

Redding failed to overturn DHS's decision at the administrative review stage and received the same result at the initial judicial review when it unsuccessfully petitioned for administrative mandate. (Code Civ. Proc., § 1094.5.) As we shall explain, we agree with these critical reviews.

## DISCUSSION

■ The issue is whether DHS was legally foreclosed—under section 14170 and the notion of administrative finality—from requiring Redding, during a timely audit, to document the historical costs of depreciable assets on which Redding claimed current reimbursable depreciation, when those historical costs had been set forth in cost reports which were considered true and correct under section 14170. This issue presents a question of law involving statutory interpretation that we review independently. (*Viking Ins. Co. v. State Farm Mut. Auto. Ins. Co.* (1993) 17 Cal.App.4th 540, 546 [21 Cal.Rptr.2d 590].)

■ Our objective in interpreting a statute is to determine legislative intent so as to effectuate the law's purpose. (*Professional Engineers v. Wilson* (1998) 61 Cal.App.4th 1013, 1019 [72 Cal.Rptr.2d 111].) The first thing we do is read the statute, and give the words their ordinary definitions unless special definitions are provided. (*Id.* at pp. 1019–1020.) If the meaning of the words is clear, then the language controls; if not, we may use various interpretive aids. (*Id.* at p. 1020.)

Section 14170, subdivision (a)(1), the statute at the center of things, states in relevant part: "(a)(1) Amounts paid for services provided to Medi-Cal beneficiaries shall be audited by the department [i.e., DHS] in the manner and form prescribed by the department. The department shall maintain adequate controls to ensure responsibility and accountability for the expenditure of federal and state funds. . . . [C]ost reports and other data for cost reporting

periods beginning on January 1, 1972, and thereafter shall be considered true and correct unless audited or reviewed within three years after the close of the period covered by the report, or after the date of submission of the original or amended report by the provider, whichever is later."

As DHS persuasively argues, the most reasonable interpretation of section 14170, subdivision (a)(1), is that if DHS has not timely audited a cost report, the data for that cost reporting period will be considered true and correct *but only for that particular cost report, not for future cost reports*. This interpretation is borne out by section 14170's language. In subdivision (a)(1), that language refers to "data for *cost reporting periods*," which "shall be considered true and correct unless audited or reviewed within three years after the close of *the period covered by the report . . . .*" (Italics added.) Subdivision (a)(2)(B) adds in consistent fashion, "data for *the fiscal periods in question.*" (Italics added.)

██  This interpretation also finds support in case law. In *Robert F. Kennedy Medical Center v. Belshé* (1996) 13 Cal.4th 748 [55 Cal.Rptr.2d 107, 919 P.2d 721] (*Robert F. Kennedy*), our state high court construed section 14170, subdivision (a)(1), as apparently requiring DHS to audit a cost report within three years of its filing or of the close of the period covered by the report. But the court also concluded that this *three-year deadline does not apply to reimbursement determinations based on that cost report.* (*Id.* at pp. 755–759.) Along the way, the *Robert F. Kennedy* court recognized the "limited scope" of the three-year requirement of section 14170, subdivision (a)(1), explaining that " 'the *sole* consequence of [DHS's] failure to audit or review a provider's cost report or other data within three years is that such information "shall be considered true and correct." ' " (*Robert F. Kennedy,* at p. 756, quoting *Palmdale Hospital Medical Center v. Department of Health Services* (1992) 8 Cal.App.4th 1306, 1313 [10 Cal.Rptr.2d 926] (*Palmdale*), italics in *Palmdale.*) That is, the information shall be considered true and correct for reimbursement determinations based on that particular cost report.

Citing the *Robert F. Kennedy* decision, this court, in *Kaiser Foundation Hospitals v. Belshé* (1997) 54 Cal.App.4th 1547 [63 Cal.Rptr.2d 652] (*Kaiser*), stated that "[p]ursuant to section 14170, if [DHS] does not audit the cost report within three years, the figures provided in that report must be accepted as true and used in the calculation to determine the proper amount of reimbursement." (*Id.* at p. 1559.) "While [DHS] must raise any challenge to the accuracy of the provider's cost report within three years, the final reimbursement figure may be determined after that period of time." (*Ibid.,* fn. 6.)

As DHS maintains, in auditing Redding for the 1996 and 1997 fiscal years, DHS was not considering the same "data" within the meaning of section

14170 even if that data had been reported in a prior cost report. Instead, DHS was reviewing data that were specific to the current depreciation claims in the 1996 and 1997 costs reports. In other words, DHS was keeping its focus on the current depreciation claims before it and was not reopening or reauditing past cost reports. The data in those past cost reports were deemed true and correct for *those cost reports* if those reports met the time/audit criteria set forth in section 14170, subdivision (a)(1).

■ Furthermore, historical costs (which are the underpinning of depreciation claims) include the costs of betterments or improvements to an asset that significantly extend the asset's estimated useful life or productivity. (42 C.F.R. § 413.134(b)(1)(ii)(D).) These betterments and improvements dispute the notion of "fixed" historical costs based on past cost reports or audits. Redding's submission of the lapsing schedule during the audit only supports this view. In that lapsing schedule, Redding acknowledged making changes in historical costs and other depreciation factors through the years pursuant to Medicare audits. The lapsing schedule itself, then, also disputes the notion of "fixed" historical costs based on past cost reports or audits.

In short, to the extent Redding continues to claim depreciation reimbursement, it must stand ready to document the historical cost underlying that current claim. This aligns with section 14170, subdivision (a)(1)'s directive to DHS to "maintain adequate controls to ensure responsibility and accountability for the expenditure of federal and state funds.".

The applicable federal regulations also support this interpretation of section 14170, subdivision (a)(1). As noted, under the federal regulations that apply to the Medi-Cal program, Redding is entitled to claim depreciation reimbursement on buildings and equipment used to provide patient care, based on the historical cost of the asset. (42 C.F.R. §§ 413.130(a)(1), 413.134(a), 413.134(b); see Cal. Code Regs., tit. 22, § 51536, subd. (a)(2).)

Pursuant to these federal regulations, Medi-Cal providers must maintain and have available for inspection documentation that supports their reimbursement requests. Title 42 of the Code of Federal Regulations, part 413.20, provides as relevant:

"(a) *General.* The principles of cost reimbursement require that providers maintain sufficient financial records and statistical data for proper determination of costs payable under the program. . . . Essentially the methods of determining costs payable . . . involve making use of data [already] available from the institution's basis accounts, as usually maintained . . . . [¶] . . . [¶]

"(d) *Continuing provider recordkeeping requirements.* (1) The provider must furnish such information to the intermediary [i.e., DHS] as may be

necessary to— [¶] (i) Assure proper payment by the program . . . . [¶] (2) The provider must permit the intermediary to examine such records and documents as are necessary to ascertain information pertinent to the determination of the proper amount of program payments due. These records include, but are not limited to, matters pertaining to— [¶] . . . [¶] (iv) *Asset acquisition, lease, sale, or other action* . . . ." (Last italics added.)

And title 42 of the Code of Federal Regulations, part 413.24, reiterates as pertinent:

"(a) *Principle.* Providers receiving payment on the basis of reimbursable cost must provide adequate cost data. This must be based on their financial and statistical records which must be capable of verification by qualified auditors. . . . [¶] . . . [¶]

"(c) *Adequacy of cost information.* Adequate cost information must be obtained from the provider's records to support payments made for services furnished to beneficiaries. The requirement of adequacy of data implies that the data be accurate and in sufficient detail to accomplish the purposes for which it is intended. Adequate data capable of being audited is consistent with good business concepts and effective and efficient management of any organization . . . . It is a reasonable expectation on the part of any agency paying for services on a cost-reimbursement basis." (Italics added.)

█ In conjunction with these applicable federal regulations, then, section 14170, subdivision (a)(1), requires documentation of asset acquisition costs (i.e., historical costs; see 42 C.F.R. § 413.134(b)) no matter when the asset was acquired, so long as depreciation on that asset is being claimed for the fiscal year that is under review pursuant to a timely audit.

The law does not require that any particular kind of record be used to document historical cost or asset acquisition, such as original invoices or receipts. Instead, the records that are offered for these purposes must satisfy the general standards of accuracy and detail set forth in section 14170 and the applicable federal regulations.

Redding raises several red flags regarding this interpretation of section 14170, subdivision (a)(1), but their unfurling only confirms our view.

Redding begins with the concept of administrative finality it sees embodied in section 14170. Redding argues that under our interpretation of that section, DHS auditors may routinely disregard final reimbursement settlements from previous fiscal years and conduct new audits of the previously audited

historical costs of assets for any fiscal year in which depreciation expenses are claimed. Redding is mistaken.

■ Under our interpretation of section 14170, subdivision (a)(1), no finalized prior settlement or finalized prior cost report or data are subject to being reopened, changed or reaudited. Under our interpretation, DHS may not question the veracity of cost reports outside the prescribed review period of three years (unless one of the exceptions to the three-year review period, such as fraud or willful delay, is implicated, which is not the case here). (See *Kaiser, supra,* 54 Cal.App.4th at p. 1559 & fn. 6; *Palmdale, supra,* 8 Cal.App.4th at p. 1313.) If a cost report is not audited or reviewed within that prescribed period, that cost report and its data are considered true and correct, but only for purposes of that particular cost report. This makes sense. The "true and correct" status accorded data under section 14170, subdivision (a)(1), arises only if DHS has failed to audit or review the cost report and data within the prescribed review period. Unaudited and unreviewed data should not be deemed true and correct for eternity, as opposed to just the period covered by the report. And even if there have been past audits, the depreciable assets may have been bettered or improved or their data adjusted in the interim. As noted, the lapsing schedule shows that Redding has made changes and adjustments in historical cost figures based on past Medicare audits. In the end, if Redding is making a current claim for depreciation, DHS should not be deemed foreclosed from verifying that current claim, including the historical cost underlying it. If Redding is not finally done making the claim, DHS should not be deemed finally done confirming it.

Under Redding's view of section 14170 finality, DHS is forever bound by Redding's reporting of a historical cost figure in a prior finalized cost report (unless the asset has been subsequently bettered or improved). Redding does not see itself so constrained, however. In the lapsing schedule it submitted for the audit of the 1996 and 1997 cost reports, Redding acknowledged that it had made several adjustments over time to the reported historical costs of depreciated assets; these adjustments were not based on betterments or improvements. The lapsing schedule not only runs counter to Redding's interpretation of section 14170 finality, it illustrates why DHS must be allowed to continue to check historical cost figures submitted in current cost reports.

In *Fountain Valley Regional Hospital & Medical Center v. Bonta´* (1999) 75 Cal.App.4th 316 [89 Cal.Rptr.2d 139], a case on which Redding relies, the court did discuss the concept of administrative finality. But that discussion does not help Redding. In *Fountain Valley,* DHS informed a hospital that it wanted to recoup reimbursement money from "final reimbursement settlements," two of which "were more than nine years old."

(*Id.* at p. 326.) Said *Fountain Valley*: "At some point, there must be finality to the [DHS's] 'final' reimbursement settlements. Otherwise, a hospital's financial planning and rational allocation of its resources will simply be impossible. Such a result is neither fair nor socially desirable." (*Ibid.*) These concerns do not permeate our interpretation of section 14170, subdivision (a)(1). Our interpretation does not reopen long-concluded reimbursement determinations, but only requires that the historical costs underlying current depreciation claims be verifiable.

■   Redding also argues that under our interpretation of section 14170, a health care provider must retain acquisition records for capital assets "indefinitely." Not so. Those records must be retained only for the useful life of the asset, plus the three-year audit period of section 14170. This is not a great burden. We are talking about acquisition and cost documents for buildings and depreciable hospital equipment, and for their significant improvements. The volume of such records pales in comparison to the volume of records that must be retained to document the services provided to each individual Medi-Cal patient. (See § 14124.1; Cal. Code Regs., tit. 22, § 51476.)

Redding additionally notes that the applicable federal regulations require Medi-Cal providers to "maintain" rather than "retain" records. (See 42 C.F.R. §§ 413.20(a), 413.24(c).) We are not sure, however, how a record can be maintained if it is not also in some sense retained.

Redding points to section 14124.1 and title 22, California Code of Regulations, section 51476, subdivision (b)(3), as setting forth a standard of three years for retaining records. Section 14124.1, however, refers to records regarding the health care services provided to Medi-Cal patients, as does the basic thrust of section 51476; additionally, section 51476 does not specify any period for record retention. (See Cal. Code Regs., tit. 22, § 51476, subd. (a).)

Redding is aghast because DHS had previously reimbursed Redding for depreciable assets such as a parking lot and a building, and those assets are still there and being used. That is true. Those assets are still there. They are plainly visible, but the same cannot be said about their historical costs.

In the end, as DHS argues, the problem with all of Redding's arguments is that they fly in the face of the accountability provisions and documentation requirements of section 14170 and the applicable federal regulations. Under Redding's interpretation of the law, once it has reported in a finalized cost report a historical cost for a depreciating asset, that figure is cast in stone for the remaining life of the asset. Under Redding's interpretation, then, it cannot adjust a stated historical cost in future years for which it claims depreciation,

even though Redding has admitted here, in its lapsing schedule, that it has done just that. This is an interpretation we will not adopt.

## DISPOSITION

The judgment is affirmed.

Blease, Acting P. J., and Hull, J., concurred.