[No. C023360. Third Dist. Feb. 25, 1998.]

PROFESSIONAL ENGINEERS IN CALIFORNIA GOVERNMENT et al., Plaintiffs and Appellants, v.
PETE WILSON, as Governor, etc., et al., Defendants and Appellants.

[No. C023368. Third Dist. Feb. 25, 1998.]

CALIFORNIA STATE EMPLOYEES ASSOCIATION et al., Plaintiffs and Appellants, v.
PETE WILSON, as Governor, etc., et al., Defendants and Respondents.

1014

COUNSEL

Loren E. McMaster, Gary P. Reynolds and Harry J. Gibbons for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Robert L. Mukai, Chief Assistant Attorney General, Floyd D. Shimomura, Assistant Attorney General, Linda A. Cabatic and Karen Leaf, Deputy Attorneys General for Defendants and Appellants.

OPINION

DAVIS, J.—At issue in these consolidated appeals is the legality of using funds from the State Highway Account (SHA) to reimburse the General Fund for payments of principal and interest on two rail bond measures passed in 1990. The state and three of its top officials (hereafter, the State) contend that article XIX, section 4 of the state Constitution permits the Legislature to use SHA funds in this manner. Two state employee groups and some individual taxpayers disagree, contending this transfer of SHA moneys violates the bond acts at issue, as well as article XIX and Streets and Highways Code section 182.

Two transfers are at issue: a $150.5 million transfer for the 1994-1995 fiscal year; and a $77 million transfer for the 1995-1996 fiscal year. We conclude that neither of these transfers violates the underlying bond acts. We also conclude, as did the trial court, that the portion of the $77 million transfer traceable to the "gas tax" violates article XIX, section 4 of the state Constitution. We therefore affirm, but correct a clerical error in the judgment in the suit involving the Professional Engineers in California Government.

BACKGROUND

In June 1990, California's voters approved two rail bond measures, Propositions 108 and 116. (Historical and Statutory Notes, 63 West's Ann. Sts. & Hy. Code (1990 ed.) § 2701.06, p. 692; Pub. Util. Code, § 99610 et seq.) Proposition 108 is known as the Passenger Rail and Clean Air Bond Act of 1990 (hereafter, Passenger Rail Bond Act (108)) and is codified at Streets and Highways Code section 2701 et seq. It authorizes the sale of $1 billion in bonds. (Sts. & Hy. Code, § 2701.10.) Bond proceeds may be spent on acquisition of rights-of-way and rolling stock (rail cars), capital improvements and expenditures, grade separations and multimodal terminals. (Sts. & Hy. Code, § 2701.06.)

Proposition 116 is known as the Clean Air and Transportation Improvement Act of 1990 (hereafter, Transportation Improvement Bond Act (116)) and is codified at Public Utilities Code section 99600 et seq. It authorizes the sale of $1,990,000,000 in bonds. (Pub. Util. Code, § 99690.5.) Bond proceeds may be spent on rail rights-of-way, stations and facilities, rolling stock, grade separations, capital expenditures, paratransit vehicles, bicycle facilities and water-borne ferry vessels and facilities. (Pub. Util. Code, §§ 99613, 99620-99653.)

Both bond measures encompass general obligation bonds, backed by the State of California. (Sts. & Hy. Code, §§ 2701.10, 2701.11; Pub. Util. Code, §§ 99690.5, 99691.5.) Both measures appropriate money from the General Fund to pay the principal and interest as those come due. (Sts. & Hy. Code, § 2701.15; Pub. Util. Code, § 99693.5.)

For the fiscal year 1994-1995, the Legislature transferred $150.5 million from SHA to the General Fund to reimburse the General Fund for debt service costs on these two rail bond measures. (Stats. 1994, ch. 139.)

For the fiscal year 1995-1996, the Legislature similarly transferred $77 million from SHA to the General Fund. (Stats. 1995, ch. 303.)

In early 1995, the State announced that it would lay off employees in the Department of Transportation (Department) due to a lack of funds. In June 1995, two state employee organizations—the Professional Engineers in California Government and the California State Employees Association, along with some individual taxpayers (hereafter, PECG and CSEA)—filed separate lawsuits; each suit encompassed a petition for writ of mandate and a complaint for declaratory and injunctive relief. The CSEA suit alleged that the $150.5 million and $77 million transfers violated the two rail bond measures and played a hand in the impending layoffs. The PECG suit focused on the $77 million transfer and its role in the announced layoffs, alleging that the transfer violated the two bond measures, article XIX of the state Constitution, and Streets and Highways Code section 182.

A bench trial was held on PECG's petition for writ of mandate. The trial court ruled that the $77 million transfer did not violate either rail bond act, or state Constitution article XIX, section 1, subdivision (b), or Streets and Highways Code section 182. The trial court did rule, however, that $16,190,000 of the $77 million SHA transfer encompassed "gas tax" funds that were transferred (spent) in violation of article XIX, section 4. The trial court also concluded that this illegal transfer did not cause the layoffs. Accordingly, the trial court granted PECG's petition for writ of mandate as to the illegal $16,190,000 million transfer and denied it in all other respects.

The PECG plaintiffs then voluntarily dismissed all of their remaining causes of action.

In light of the trial court's ruling in the PECG action, the parties in the CSEA suit stipulated to a judgment there denying the petition for writ of mandate and dismissing the complaint for declaratory and injunctive relief, with CSEA reserving its right to appeal.

The State then appealed the trial court's grant of the PECG petition for writ of mandate as to the $16,190,000 portion of the $77 million transfer. The State contends that article XIX, section 4 of the state Constitution authorizes the $16,190,000 transfer; in any event, the State argues, PECG failed to prove its case on this point and there is a roughly $4 million clerical error in the PECG judgment. PECG has cross-appealed from the trial court's denial of the remainder of its petition. PECG claims the $77 million transfer violates the two rail bond measures; article XIX, sections 1, subdivision (b) and 4 of the state Constitution; and Streets and Highways Code section 182. CSEA has also appealed, contending that the $150.5 million and the $77 million transfers violate the two rail bond measures.

## DISCUSSION

### 1. *The Bond Acts*

CSEA, in its appeal, and PECG, in its cross-appeal, contend the State violated the two bond acts by using SHA funds, rather than the General Fund, to pay principal and interest on the bonds issued pursuant to the bond acts. CSEA and PECG rely on the statutes comprising the two bond acts and the ballot measures for the acts, and argue that the voters intended to increase mass transit spending without depleting existing transportation funds, such as SHA.

The trial court ruled that the language in the bond acts and in their ballot materials does not prohibit payments on bonds from being made with funds transferred to the General Fund from another source. As CSEA notes, this issue presents a question of law involving statutory interpretation that we consider independently. (See *California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 699 [170 Cal.Rptr. 817, 621 P.2d 856].)

When we interpret a statute, we attempt to determine legislative intent so as to effectuate the purpose of the law. (*Burden* v. *Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].) The first thing we do

is read the statute, and do so in an ordinary way unless special definitions are provided. (*Halbert's Lumber, Inc.* v. *Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238 [8 Cal.Rptr.2d 298],) If the meaning of the words is clear, then the language controls. (*Halbert's Lumber, Inc., supra,* 6 Cal.App.4th at p. 1239.) But if the meaning of the words is not clear, courts can use interpretive aids; with respect to voter-approved enactments, these aids include the ballot analysis, the official summary, and the arguments presented to the voters. (*Ibid.*; *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281].)

■ We consider two sets of statutes here. One set encompasses the statutes comprising the two rail bond acts. (Sts. & Hy. Code, § 2701 et seq. (Passenger Rail Bond Act (108)); Pub. Util. Code, § 99600 et seq. (Transportation Improvement Bond Act (116)).) The other set encompasses the statutes that transferred the challenged SHA funds to the General Fund. (Stats. 1994, ch. 139; Stats. 1995, ch. 303.) Because the two SHA transfers were legislative acts, they implicate, for purposes of our analysis, an important principle of lawmaking authority. ■ " '[T]he entire law-making authority of the state, except the people's right of initiative and referendum, is vested in the [state] Legislature, and that body may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the [state] Constitution.' " (*Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168, 180 [172 Cal.Rptr. 487, 624 P.2d 1215], italics omitted, quoting *Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 691 [97 Cal.Rptr. 1, 488 P.2d 161]; *California Teachers Assn.* v. *Hayes* (1992) 5 Cal.App.4th 1513, 1531-1532 [7 Cal.Rptr.2d 699].) With these principles in mind, we begin our analysis.

■ The pertinent rail bond statutes show the following. The bonds issued under both the Passenger Rail Bond Act (108) and the Transportation Improvement Bond Act (116) are general obligation bonds. (Sts. & Hy. Code, § 2701.11; Pub. Util. Code, § 99691.5; all further references to section 2700 series are to the Streets and Highways Code; all further references to section 99000 series are to the Public Utilities Code.) Both acts specify that "[t]here shall be collected [every year] and in the same manner and at the same time as other state revenue is collected, in addition to the ordinary revenues of the state, a sum in an amount required to pay the principal of, and interest on, the bonds each year." (§ 2701.14; § 99693.) And both acts require appropriations from the General Fund in amounts annually necessary to pay the principal and interest for the bonds issued and sold. (§ 2701.15; § 99693.5.)

These statutes obligate the General Fund to pay the principal and interest on the bonds issued under these two bond acts. These statutes do not specify

whether the General Fund can be reimbursed, while retaining the ultimate obligation to pay the bond debt. The statutory language is not clear in this regard.

On this point, the ballot materials add little to the statutory language. The official summaries for the two bond acts state that the acts appropriate money from the General Fund to pay off the bonds. The legislative analyst's analyses note that the state is obligated to pay the principal and interest costs on these general obligation bonds. Those analyses explain that General Fund revenues will be used to pay these costs, and note that such revenues come primarily from state income and sales taxes. An argument against the Passenger Rail Bond Act (108) states that using general obligation bonds—which are paid for by all taxpayers—is not sound fiscal policy; revenue bonds—paid for by the system's users—make more sense. A similar argument against the Transportation Improvement Bond Act (116) suggests that rail projects should be paid for with transportation funds. (Ballot Pamp., Primary Elec. (June 5, 1990) pp. 8-11, 36-39; hereafter June 1990 Ballot Pamp.)

The ballot language, like the statutory language, obligates the General Fund to pay the bond debt. The ballot language, like the statutory language, does not cover the issue of whether the General Fund can be reimbursed for this expense while retaining the ultimate obligation to pay it. (June 1990 Ballot Pamp., *supra*, pp. 9, 60; pp. 37, 69-74.)

Drawing a distinction here between reimbursement and obligation is not a matter of elevating form over substance. The General Fund retains its role as the guarantor and basic payment source of the bond debt. Regardless of whether reimbursement is possible, the General Fund still serves as the legal and financial hub of these bond acts. Viewed in this way, reimbursement is distinct from obligation. The estimated annual cost to finance these two bond acts runs between $180 million and $270 million. Only two years are in issue regarding these 1990 acts, one involving a SHA reimbursement to the General Fund of about $150.5 million and the other involving, a year later, a SHA reimbursement of $77 million. (Stats. 1994, ch. 139; Stats. 1995, ch. 303.)

Drawing a distinction between reimbursement and obligation cannot be taken too far, however. Funding restrictions cannot be ignored through the guise of a theoretical legal "obligation." That did not happen here.

■ Statutes relating to the same subject—as with the two sets of statutes here concerning the financing of bond debt—must be harmonized and given effect if possible. (*Dyna-Med., Inc.* v. *Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) ■ Harmony is achieved when reimbursement and obligation are viewed

in this way. This analysis also gives proper deference to the Legislature's nearly complete lawmaking authority—we examine legislative acts only to see if they are prohibited. (See *Pacific Legal Foundation* v. *Brown, supra,* 29 Cal.3d at p. 180; *Methodist Hosp. of Sacramento* v. *Saylor, supra,* 5 Cal.3d at p. 691; *Dean* v. *Kuchel* (1951) 37 Cal.2d 97, 100 [230 P.2d 811]; *California Teachers Assn.* v. *Hayes, supra,* 5 Cal.App.4th at pp. 1531-1532.)

Based on the statutory and ballot language regarding the general fund, and relying in particular on Public Utilities Code section 99611 relating to the Transportation Improvement Bond Act (116), CSEA and PECG make their principal argument—that the voters intended to increase mass transit spending without depleting existing transportation funds, such as SHA. According to this argument, the voters intended to achieve this objective by using the General Fund to service the bond debt; therefore, reimbursing the General Fund with a transportation fund like SHA violates the bond acts.

Public Utilities Code section 99611 specifies the People's intent regarding the Transportation Improvement Bond Act (116). The bond funds are not to displace existing funding for rail and other forms of public transportation; any future comprehensive transportation funding legislation is not to offset or reduce the amounts otherwise made available for transit purposes by the act; and funding for public transit should be increased from existing sources including fuel taxes and sales tax on fuels.[1]

CSEA and PECG frame their argument too broadly—that the voters intended to increase mass transit spending without depleting *any* existing *transportation* funds, such as SHA. From the statement of intent set forth in section 99611, the voters intended to increase mass transit spending without depleting or displacing any existing *public transportation* (mass transit) funds. Indeed, section 99611 provides that public transit funding should be increased from existing transportation funds like fuel taxes and sales taxes on fuels.

At the trial on PECG's petition for writ of mandate, the State presented a detailed declaration from the Chief Deputy Director of the California Transportation Commission, Pete Hathaway. Hathaway explained the procedure

---

[1]Section 99611 provides: "It is the intent of the people of California, in enacting this part, that bond funds shall not be used to displace existing sources of funds for rail and other forms of public transportation, including, but not limited to, funds that have been provided pursuant to Article XIX of the California Constitution, the Transportation Planning and Development Account in the State Transportation Fund, the Mills-Alquist-Deddeh Act (Chapter 4 (commencing with Section 99200) of Part 11), and local transportation sales taxes; that any future comprehensive transportation funding legislation shall not offset or reduce the amounts otherwise made available for transit purposes by this act; and that funding for public transit should be increased from existing sources including fuel taxes and sales tax on fuels."

that is used to ensure that no transportation improvement bond funds displace existing funding for rail and other forms of public transportation; he concluded that, to the best of his knowledge, these bond funds have not displaced such existing funding. There is no evidence that bond funds from the Passenger Rail Bond Act (108) have displaced any existing funding for rail and other forms of public transportation. The overwhelming bulk of SHA funds is designated for highway spending. There is no evidence that SHA funds or other transportation funds already earmarked for mass transit have been directed to the General Fund for this bond debt reimbursement. The parties concede there are no factual disputes regarding the general issue of whether the SHA reimbursements are valid under the bond acts.

In sum, CSEA's and PECG's broader interpretation of voter intent to increase mass transit spending without depleting *any* existing *transportation* funds (as opposed to existing *public transportation* funds) is not found in the statutory or ballot language.

We conclude that the two SHA reimbursements to the General Fund of $150.5 million and $77 million do not violate the bond acts.

### 2. *Article XIX, Section 4 of the State Constitution*

■ In its appeal, the State contends that article XIX, section 4 of the state Constitution permits the Legislature, absent local or area-voter approval, to use the motor vehicle fuel tax portion of the $77 million SHA transfer to reimburse the General Fund for part of the cost of servicing the debt on the two bond acts. The trial court ruled, otherwise, invalidating the $77 million SHA reimbursement to the extent it included motor vehicle fuel taxes ($16,190,000).[2]

Motor vehicle fuel taxes include motor vehicle fuel license taxes (i.e., gasoline taxes) and use fuel taxes (i.e., diesel taxes). (Rev. & Tax. Code, §§ 7301-7357, 8601-8657.) For simplicity, we will refer to these taxes as "gas taxes."

From 1938 to 1974, gas taxes could be used for highway purposes only. (Cal. Const., former art. XXVI, § 1.) In 1974, former article XXVI was repealed and reenacted in an expanded version (renumbered as article XIX in 1976); this expanded version reflected environmental concerns, providing for the research and development of public mass transit systems subject to

---

[2]The only issue raised regarding the $150.5 million SHA reimbursement concerned the question of whether it violated the bond acts. (See part 1 of the Discussion, *ante*.) The issue regarding article XIX of the state Constitution concerns only the $77 million SHA reimbursement.

local or area voter approval. (Cal. Const., art. XIX, §§ 1-4; *Kizziah v. Department of Transportation* (1981) 121 Cal.App.3d 11, 17 [175 Cal.Rptr. 112]; Sen. Const. Amend. No. 15, Stats. 1973 (1973-1974 Reg. Sess.) res. ch. 145, pp. 3275-3277; Ballot Pamp., Primary Elec. (June 4, 1974) [hereafter June 1974 Ballot Pamp.], materials for Prop. 5, pp. 20-23, 39 [Cal. Const., former art. XXVI].)

Article XIX, section 1 of the state Constitution, provides in part:

"Revenues from taxes imposed by the State on motor vehicle fuels for use in motor vehicles upon public streets and highways . . . shall be used for the following purposes:

(a) The research, planning, construction, improvement, maintenance, and operation of public streets and highways . . . .

(b) The research, planning, construction, and improvement of exclusive public mass transit guideways (and their related fixed facilities), . . . but excluding the maintenance and operating costs for mass transit power systems and mass transit passenger facilities, vehicles, equipment, and services."

Article XIX, section 3 of the state Constitution provides in part: "The Legislature shall provide for the allocation of the revenues to be used for the purposes specified in Section 1 of this article in a manner which ensures the continuance of existing statutory allocation formulas for cities, counties, and areas of the State, until it determines that another basis for an equitable, geographical, and jurisdictional distribution exists; provided that, until such determination is made, any use of such revenues for purposes specified in subdivision (b) of Section 1 of this article by or in a city, county, or area of the State shall be included within the existing statutory allocations to, or for expenditure in, that city, county or area."

And article XIX, section 4 of the state Constitution, provides: "Revenues allocated pursuant to Section 3 may not be expended for the purposes specified in subdivision (b) of Section 1, except for research and planning, until such use is approved by a majority of the votes cast on the proposition authorizing such use of such revenues in an election held throughout the county or counties, or a specified area of a county or counties, within which the revenues are to expended. The Legislature may authorize the revenues approved for allocation or expenditure under this section to be pledged or used for the payment of principal and interest on voter-approved bonds issued for the purposes specified in subdivision (b) of Section 1."

As noted, the $77 million SHA reimbursement to the General Fund to pay for part of the bond debt was a legislative act. (Stats. 1995, ch. 303.) The

issue raised by the State in its appeal is whether the gas tax portion of this legislative act is constitutional under article XIX, section 4 of the state Constitution.

■ In considering the state constitutionality of a legislative act we presume its validity, resolving all doubts in favor of the act. (*California Housing Finance Agency* v. *Elliott* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193].) Unless conflict with a state constitutional provision is clear, we must uphold the act. (*Ibid.*) Thus, if possible, we will interpret a statute as consistent with applicable constitutional provisions, seeking to harmonize and to give effect to both Constitution and statute. (*Ibid.*) The rules of statutory interpretation delineated in the previous section of this opinion guide our interpretation as well.

■ The State looks to the second sentence of article XIX, section 4 of the state Constitution, and argues that it permits the Legislature to use the gas tax part of the $77 million SHA transfer to reimburse the General Fund for the bond debt. According to the State, the first sentence of article XIX, section 4 regulates spending by local entities of gas taxes allocated to them by statute. (Gas taxes are distributed to local governments according to a complex statutory formula (Sts. & Hy. Code, §§ 2101-2108).) The second sentence, the State asserts, regulates spending by the Legislature, permitting the Legislature to spend gas taxes on state voter-approved bonds issued for mass transit guideway purposes. The second sentence, according to the State's argument, does not require the Legislature to get the electorate's permission to spend gas taxes on such bonds.

The trouble with the State's interpretation is that it reads the second sentence of article XIX, section 4 of the State Constitution in isolation. The words of a constitutional provision, however, like the words of a statute, must be construed in context, keeping in mind the constitutional purpose. (See *Dyna-Med, Inc.* v. *Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1387.) The key phrase in the second sentence, for our purposes, is that the Legislature may authorize "*the revenues approved for allocation or expenditure under this section*" (italics added) to be pledged or used for bond debt. This phrase ties the revenues to the relevant locality or area. (See Cal. Const., art. XIX, §§ 3, 4.) That is, the Legislature can authorize the locality or area to use its allocation- or expenditure-approved funds to be pledged or used for local or area mass transit guideway bond debt. (See Cal. Const., art. XIX, §§ 4, 5; Sts. & Hy. Code, § 2101, subds. (c) & (d); *Kizziah* v. *Department of Transportation, supra,* 121 Cal.App.3d at p. 17; 47 Ops.Cal.Atty.Gen. 145 (1966); Sen. Const. Amend. No. 15, Stats. 1973, *supra,* res. ch. 145, pp. 3275-3277; June 1974 Ballot Pamp., *supra,* materials for Prop. 5, pp. 20-23, 39 [Cal. Const., former art. XXVI].)

The State also looks to article XIX, section 5 of the state Constitution, and asserts that section 5 closely parallels section 4. Section 5 states that "[t]he Legislature may authorize up to 25 percent of the revenues available for expenditure by any city or county, or by the State, for the purposes specified in subdivision (a) of Section 1 of this article [public streets and highways] to be pledged or used for the payment of principal and interest on voter-approved bonds issued for such purposes."

For the purposes of this case, however, sections 4 and 5 of article XIX of the state Constitution are not parallel. Under section 4, "[t]he Legislature may authorize the revenues *approved for allocation or expenditure under this section*" to be pledged or used for bond debt. (Italics added.) Under section 5, "[t]he Legislature may authorize . . . the revenues *available for expenditure by any city or county, or by the State*" to be pledged or used for bond debt. (Italics added.) Under section 4, then, the revenues have been approved for allocation to the locality or area or have been approved for expenditure by the locality or area, while under section 5 certain revenues are available for expenditure by the State.[3]

Finally, the State's interpretation of the second sentence of article XIX, section 4 of the state Constitution leads to an incongruous outcome. Under that interpretation, the first sentence of section 4 would require local or area voter approval to spend state legislatively allocated gas taxes on the construction and improvement of public mass transit guideways. But the second sentence would allow the Legislature to use these same allocated gas taxes to pay off State bond debt without requiring local or area voter approval. (See Cal. Const., art. XIX, §§ 3, 4.)

The trial court had it right. As that court said, "[t]he effect of these Constitutional provisions [article XIX, §§ 1(b), 3 and 4] is to forbid the use

---

[3]The State's view of the Legislature's power under the second sentence of article XIX, section 4 of the State Constitution, also runs contrary to the ballot materials for the 1974 voter proposition, Proposition 5, which added article XIX's predecessor to the Constitution, former article XXVI, added 1974. (That article was renumbered article XIX in 1976. (*Kizziah* v. *Department of Transportation, supra,* 121 Cal.App.3d at p. 17).) As one of the ballot arguments in favor of Proposition 5 explained: "The opposition says that 'to permit the Legislature to use motorists' tax funds for other than motorists' needs would be wrong . . . adding an element of unfairness to our tax structure.' [¶] **This statement is misleading.** [¶] Proposition 5 **does not** permit the Legislature to use motorists' taxes to build public mass transit systems. Such construction may only take place if the voters in the area where the system would be built give their prior approval in a local election. In other words, each county or area would determine the best transportation use for its motorists' taxes." (June 1974 Ballot Pamp., *supra,* rebuttal to argument against Prop. 5, p. 23, emphasis in original; see *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at pp. 245-246.)

of motor vehicle fuel tax revenues for [mass transit guideway] projects related to rail transportation [except for research and planning] unless the money is spent on a project which has been approved by the voters in an election in the area in which the project is to be built." (See Cal. Const., art. XIX, §§ 1, 3, 4, 5; Sts. & Hy. Code, § 2101, subds. (c) & (d); *Kizziah v. Department of Transportation, supra,* 121 Cal.App.3d at p. 17; 47 Ops.Cal. Atty.Gen., *supra,* 145.) The trial court noted there had been no showing that voters in any county or counties or specified area, within which the gas taxes were to be spent for mass transit guideway purposes, had approved such expenditure in an election, as required by article XIX, section 4.

Aside from its interpretation of the second sentence of article XIX, section 4 of the state Constitution, the State also argues that PECG failed to meet its burden of showing that no elections pursuant to that section had been held. There was simply no evidence on this point, the State asserts. On appeal, PECG has asked us to take judicial notice of the fact that no article XIX, section 4 local or area elections have been held that would authorize the use of gas taxes to pay the state bond debt here. (Evid. Code, § 452, subd. (h).) Although it had an opportunity to do so, the State has not opposed this request for judicial notice. We take such judicial notice. (Evid. Code, § 459.)

Article XIX of the state Constitution forbids only gas taxes from being used for mass transit guideway construction and improvement, absent local or area voter approval. The State presented a declaration from the Department's Deputy Director of Finance, Martin Kiff, that during the 1995-1996 fiscal year, which covered the $77 million SHA reimbursement, an estimated $60,810,000 in nongas tax funds were deposited into SHA. These nongas tax funds are not subject to the restrictions of article XIX. (Cal. Const., art. XIX, § 1.) (7)(See fn. 4.) Based on Kiff's declaration, the trial court found that only $16,190,000 of the $77 million SHA reimbursement were gas taxes ($77 million minus $60,810,000 equals $16,190,000) and therefore invalidated by the voter requirement of article XIX, section 4.[4]

In its cross-appeal, PECG claims that Kiff's declaration constitutes insufficient evidence to support the trial court's finding that traced the gas

---

[4]In his declaration (dated October 1995), Kiff estimated that $60,810,000 from the nongas tax sources of rental property income and miscellaneous income would be deposited into SHA during the 1995-1996 fiscal year. This $60,810,000 amount was comprised as follows: $31 million in rental property income, of which 24 percent or $7,440,000 is returned to local governments, leaving SHA with $23,560,000 (see Sts. & Hy. Code, §§ 104.6, 104.10); plus an estimated $37,250,000 in miscellaneous income from 11 sources. However, the estimate of these 11 sources of miscellaneous income actually added up to $41,150,000. The trial court added the $23,560,000 to the erroneously added $37,250,000 to find that $60,810,000 of the $77 million SHA reimbursement constituted nongas tax moneys and $16,190,000 constituted gas tax funds. The actual amount of gas taxes illegally transferred pursuant to the $77 million SHA reimbursement totals $12,290,000 ($23,560,000 plus $41,150,000 equals $64,710,000 in

tax and nongas tax funds in the $77 million SHA reimbursement. PECG notes that Kiff provided only an estimate for the miscellaneous income portion, and failed to specify whether the nongas tax portion of the $77 million was ever really available to transfer to the general fund for the bond debt at issue here. PECG claims that in light of these lapses, the entire $77 million must be considered gas taxes invalidated by article XIX, section 4 of the state Constitution.

An estimate of the miscellaneous income was necessary, however, because Kiff made his declaration in October 1995, during the fiscal year at issue (1995-1996). Moreover, as its name implies, miscellaneous income covered an array of funding sources. There is nothing in the record indicating that Kiff's estimates were inaccurate. As for the funding availability of the nongas tax portion of the $77 million, it was PECG who filed the petition for writ of mandate and who bore the burden of showing that the entire $77 million reimbursement constituted gas taxes that violated the spending restrictions of California Constitution article XIX. Analyzing the fund-tracing issue in this way also serves to harmonize constitutional and statutory provisions while requiring an authentic accounting for tracing purposes. (See 17 Ops.Cal.Atty.Gen. 157, 160-161 (1951); see also *California Housing Finance Agency* v. *Elliott, supra,* 17 Cal.3d at p. 594.) There is sufficient evidence to support the trial court's (clerically corrected) finding in this regard.

We conclude that $12,290,000 of the $77 million SHA reimbursement constituted gas taxes that were spent in violation of the election requirement of article XIX, section 4 of the state Constitution.[5]

---

nongas taxes not subject to article XIX of the state Constitution, leaving $12,290,000 in gas taxes subject to article XIX, for a $77 million total).

A clerical error in a judgment that is shown by the record may be corrected at any time. (*Hennefer* v. *Butcher* (1986) 182 Cal.App.3d 492, 506 [227 Cal.Rptr. 318].) An appellate court may correct a judgment containing an obvious clerical error resulting from inadvertence by modifying the judgment. (*Id.* at pp. 506-507.) We will modify the judgment to reflect that $12,290,000 was illegally transferred to the General Fund in the $77 million SHA reimbursement.

[5]In its cross-appeal, PECG contends the $77 million SHA reimbursement also violated article XIX, section 1, subdivision (b) of the state Constitution, because part of the $77 million was spent on nonguideway mass transit items under the terms of the bond acts. We have concluded that only $12,290,000 of the $77 million are gas taxes subject to the article XIX restrictions. We have also invalidated the transfer of this $12,290,000 because no elections were held regarding these funds pursuant to article XIX, section 4. At this point, then, before any article XIX, section 4 elections have been held regarding the $12,290,000, it is premature to discuss the applicability of article XIX, section 1, subdivision (b), to these funds.

### 3. *Streets and Highways Code Section 182*

That brings us to the last issue, one that we can address with some dispatch. In its cross-appeal, PECG contends the $77 million SHA reimbursement violates the purposes for which SHA funds can be spent. PECG is mistaken.

The general statute describing the uses to which SHA funds may be put, Streets and Highways Code section 182, does not limit the use of SHA moneys to highways, but states that SHA may be used "for expenditure on work within the powers and duties of the [D]epartment. . . ." Rail mass transit projects are within the powers and duties of the Department. (See e.g., Sts. & Hy. Code, §§ 163, 164.) Furthermore, Streets and Highways Code section 183.3 expressly contemplates that SHA funds can be appropriated not only for public mass transit guideway projects, but also for the more problematic expenditures, from PECG's point of view, of non-guideway items like rolling stock, ferry vessels and ferry terminals. (See Pub. Util Code, § 99317, subd. (a).)

### DISPOSITION

The judgment in No. 95CS01313 is modified to read, as italicized: "1. The petition for writ of mandate is GRANTED as to the *$12,290,000* that was transferred from the State Highway Account to the General Fund . . . . [¶] 2. . . . and is specifically denied as to the remaining *$64,710,000* that was transferred from the State Highway Account to the General Fund . . . ." As modified, the judgments are affirmed. All parties will pay their own costs of appeal.

Blease, Acting P. J., and Scotland, J., concurred.

Petitions for a rehearing were denied March 19, 1998.