[No. C040864. Third Dist. Aug. 29, 2003.]

DOTTIE WOOD et al., Plaintiffs and Appellants, v.
COUNTY OF SAN JOAQUIN et al., Defendants and Respondents.

[No. C042207. Third Dist. Aug. 29, 2003.]

DOTTIE WOOD et al., Plaintiffs and Appellants, v.
CITY OF LODI, Defendant and Respondent.

**COUNSEL**

Tennant, Ingram & Randon and David M. Ingram for Plaintiffs and Appellants.

Terrence R. Dermody, County Counsel, Shelley Green and Sheryle L. Sparks, Deputy County Counsel, for Defendant and Respondent County of San Joaquin.

Bill Lockyer, Attorney General, Andrea Lynn Hoch and James M. Schiavenza, Assistant Attorneys General, Darryl L. Doke and William A. Krabbenhoft, Deputy Attorneys General, for Defendant and Respondent State of California.

Randall A. Hays, City Attorney, D. Stephen Schwabaur, Deputy City Attorney, for Defendant and Respondent City of Lodi.

**OPINION**

**DAVIS, Acting P. J.**—In this wrongful death and survival action, plaintiffs appeal from demurrers sustained in favor of the State of California (State), the County of San Joaquin (County), and the City of Lodi (City) (collectively, the public entities).

A motorboat struck the decedents while they were fishing from their canoe. The pivotal issue is whether fishing from a canoe tethered near the shore of a public waterway which is also used by powerboats is considered "boating" under the "hazardous recreational activity" immunity statute. (Gov. Code, § 831.7.)[1] This statute immunizes public entities from liability for injuries suffered by participants in a "hazardous recreational activity" on public

---

[1] Further undesignated section references are to the Government Code.

property, and lists several such activities including "boating." (§ 831.7, subds. (a), (b)(3).) We conclude the decedents were boating when they suffered their injuries and that section 831.7 applies in favor of the public entities here. Consequently, we affirm.

## BACKGROUND

On June 25, 2000, Thomas Farnsworth and his son, Tommy, were fishing from a canoe anchored a few feet from the shoreline of the Mokelumne River at or near the mouth of Lodi Lake. A motorboat towing a water-skier collided with the canoe. Tommy died at the scene of the accident. Thomas died about six months later as a result of complications from the accident.

The surviving family members (plaintiffs) have sued the public entities, alleging wrongful death and survival claims. Because we are reviewing demurrers to the complaint, we examine the complaint's allegations to see if a cause of action has been or can be stated. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126 [119 Cal.Rptr.2d 709, 45 P.3d 1171] (*Zelig*).) In their complaint, plaintiffs allege that the public entities are liable because the injuries and deaths were caused by a dangerous condition on public property and the public entities failed to warn of the danger or remedy the condition. (§ 835 [a public entity may be liable for injury caused by a known, dangerous condition of its property].)

As for the dangerous condition, the complaint specifically alleges that "vegetation impeded the visibility of vessel operators on the waterways, that vessels upon said waterways routinely operated at unsafe speeds, that vessels upon said waterways routinely pulled skiers and similar water activists, that said waterways were comprised of narrow channels, that said waterways were comprised of blind curves and corners, that said conditions were highly inappropriate for unrestricted watercraft speeds, that said conditions were highly inappropriate for the pulling of skiers and similar water activists, that said waterways were used by non[]motorized vessels as well as motorized vessels, that operators of vessels were known to operate said vessels while intoxicated, that no limitations were imposed on speeds or uses for vessels using the waterways, that insufficient patrols were delegated to the waterways, and that said conditions, mixed uses, and lack of patrols and speed and use restrictions created a serious risk of death or bodily injury to users of the waterways."

Plaintiffs also contend that they can amend the complaint to allege that boat docks and swim platforms within 50 feet of the accident site further narrowed the 100-foot-wide channel and subjected passing motorboats to a maxi mum speed of five miles per hour (m.p.h). under Harbors and Navigation Code section

655.2. Plaintiffs also maintain that "said channel was regularly used by waterskiers and wake boarders in violation of" that law; and that "the driver of the [colliding] motorboat was performing a loop through the channel and around an island in a pattern routinely used by ski boats."

As for the failure to warn of the danger or to remedy the condition, plaintiffs allege that the public entities had known of the dangerous condition for 30 years or more. Plaintiffs would amend the complaint to allege that, for decades, the public entities studied the dangerous conditions on Lodi Lake caused by powerboats. Despite these studies, the public entities never adequately addressed the problem to prevent the accident that resulted in the deaths of Thomas and Tommy Farnsworth. Plaintiffs suggest the public entities should have placed five-mile-per-hour speed limit signs, buoys, or a barrier, or a few extra patrols to prevent motorboats from speeding through the channel near the boat docks and swim platforms.

## DISCUSSION

### 1. *Standard of Review*

The trial court sustained the public entities' demurrers without leave to amend. ■ We treat the demurrers as admitting all material facts properly pleaded by the complaint, but not contentions, deductions or conclusions of fact or law. (*Zelig, supra,* 27 Cal.4th at p. 1126.) We also consider judicially noticed matters. When a trial court sustains a demurrer without leave to amend, we determine whether there is a reasonable possibility that the plaintiff can cure the defect by amendment. If the plaintiff can, we reverse. If not, we affirm. The burden of proving such reasonable possibility is on the plaintiff. (*Ibid.*)

### 2. *Hazardous Recreational Activities Immunity to Dangerous Condition Liability*

The public entities argue they are not liable because the decedents were participating in the "hazardous recreational activity" of "boating" under the section 831.7 public entity immunity to dangerous condition liability. Plaintiffs respond that the decedents were not engaged in a "hazardous recreational activity" because canoeing is not listed in section 831.7 and the danger of another boat colliding with the canoe was not a foreseeable risk when the decedents were sitting in their canoe fishing by the shore.

Section 831.7 provides in pertinent part:

"(a) Neither a public entity nor a public employee is liable to any person who participates in a hazardous recreational activity, including any person

who assists the participant,... for any damage or injury to property or persons arising out of that hazardous recreational activity.

"(b) As used in this section, 'hazardous recreational activity' means a recreational activity conducted on property of a public entity which creates a substantial (as distinguished from a minor, trivial, or insignificant) risk of injury to a participant or a spectator.

" 'Hazardous recreational activity' also means:

"(1) Water contact activities, except diving, in places where or at a time when lifeguards are not provided ....

"(2) Any form of diving into water from other than a diving board or diving platform ....

"(3) Animal riding, including equestrian competition, archery, bicycle racing or jumping, mountain bicycling, *boating*, cross-country and downhill skiing, hang gliding, kayaking, motorized vehicle racing, off-road motorcycling or four-wheel driving of any kind, orienteering, pistol and rifle shooting, rock climbing, rocketeering, rodeo, spelunking, sky diving, sport parachuting, paragliding, body contact sports (i.e., sports in which it is reasonably foreseeable that there will be rough bodily contact with one or more participants), surfing, trampolining, tree climbing, tree rope swinging, water-skiing, white water rafting, and windsurfing. For the purposes of this subdivision, 'mountain bicycling' does not include riding a bicycle on paved pathways, roadways, or sidewalks.

"(c) Notwithstanding the provisions of subdivision (a), this section does not limit liability which would otherwise exist for any of the following:

"(1) Failure of the public entity or employee to guard or warn of a known dangerous condition or of another hazardous recreational activity known to the public entity or employee that is not reasonably assumed by the participant as inherently a part of the hazardous recreational activity out of which the damage or injury arose. [¶] ... [¶]

"(5) An act of gross negligence by a public entity or a public employee which is the proximate cause of the injury." (§ 831.7, italics added.)

At issue is whether the term "boating," in section 831.7, subdivision (b)(3), includes fishing from a canoe tethered near the shore of a public waterway which is also used by powerboats. ▪ In interpreting a statute, we attempt to determine legislative intent so as to effectuate the purpose of the

law. The first thing we do is read the statute, and do so in an ordinary way unless special definitions are provided. If the meaning of the words is clear, then the language controls; if not, we can use various interpretive aids. (*Professional Engineers v. Wilson* (1998) 61 Cal.App.4th 1013, 1019–1020 [72 Cal.Rptr.2d 111].) "[L]egislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him." (*Addison v. Holly Hill Fruit Products, Inc.* (1944) 322 U.S. 607, 618 [88 L.Ed. 1488, 64 S.Ct. 1215].)

Indisputably, a canoe is a boat. For example, a canoe is defined as "[a] light, slender boat with pointed ends, propelled by paddles." (American Heritage Dict. (2d college ed. 1982) p. 234.) It is also defined as "a light narrow boat with both ends sharp that is usu[ally] propelled by paddling." (Webster's 10th New Collegiate Dict. (2001) p. 166.) Finally, it is defined as "a long and narrow boat that is sharp at both ends ...." (Webster's 3d New Internat. Dict. (1986) p. 328.) Thus, in common usage, a canoe is a type of boat.

The dictionary definitions of a "boat" yield similar results. A boat is "[a] relatively small, usually open craft." (American Heritage Dict., *supra*, at p. 192.) Similarly, it is "a small vessel for travel on water." (Webster's 10th New Collegiate Dict., *supra*, at p. 127.) A canoe is a boat according to these definitions because a canoe is typically a small open craft.

The pivotal issue, however, is not simply whether a canoe is a boat, but whether the decedents were "boating" within the meaning of section 831.7. Plaintiffs argue that merely sitting in a canoe tethered near a shoreline should not be considered "boating" because such a construction is absurd on its face. As we did for "boat," we look first to the dictionaries for the definition of "boating."

The word "boating" is defined in several ways. As a verb, it can mean "to go by boat" (Webster's 3d New Internat. Dict. Unabridged (1969) p. 244), "[t]o travel by boat," "[t]o ride in a boat for pleasure," "[t]o transport by boat," and "[t]o place in a boat" (American Heritage Dict., *supra*, at p. 192). As a noun, it can also mean "the act or sport of one who boats." (Webster's 3d New Internat. Dict., *supra*, at p. 244.)

To limit the definition of "boating," as plaintiffs do, to include only boats that are traveling, invokes its own absurdity and would be a difficult rule to implement. For example, if one boat is anchored and another is unanchored on a public waterway, and a third boat collides with them both, the passengers of the anchored boat are not "boating" under plaintiffs'

construction of section 831.7, but the passengers of the unanchored boat are. Also, a boat that is floating on the water, tethered or not, constantly moves with the waves, wakes and currents; thus, it is never truly stationary. Parties litigating whether or not a boat was moving for the purposes of liability would have to overcome this fallacy. ■ We find, therefore, that the term "boating" encompasses the activity of being in a boat that is traveling as well as one that is "stationary" but floating in the water. We do add, however, that this case does not involve a houseboat or a boat used as a residence or something similar; we express no views on these subjects.

Plaintiffs counter that "boating" is substantively different from merely sitting in a stationary canoe because such sitting does not involve the risks inherent in boating. Plaintiffs maintain that being hit by a powerboat while sitting in a canoe tethered near a shoreline is not foreseeable, nor is it a risk inherent in fishing from such a canoe. We find, however, that many, if not most, of the principal risks inherent in "boating" are still present when a canoe is stationary but floating in the water. A canoe may be hit by another boat whether it is traveling or stationary; in fact, plaintiffs have alleged that powerboats "routinely" and "regularly" used the waterway where the decedents' accident occurred. (See 10 Cal.Jur.3d pt. 2 (1996) Boats & Boating, § 54 [recognizing the duty of boat operators to avoid collisions].) A canoe can sink whether it is traveling or stationary. Similarly, a passenger can fall overboard even if a canoe is stationary. In *Carrick v. Pound* (1969) 276 Cal.App.2d 689 [81 Cal.Rptr. 234], the Court of Appeal found that wave action that causes a boat to pitch and churn is a natural danger of boating. (*Id.* at pp. 692–693.) A larger boat that passes close enough to a stationary canoe can create a wave or wake that can swamp the canoe. (See 10 Cal.Jur.3d, *supra,* Boats & Boating, § 54.)

■ Furthermore, the section 831.7, subdivision (a) phrase, "arising out of th[e] hazardous recreational activity" broadly encompasses the objectively foreseeable risks of participating in a hazardous recreational activity. (*Decker v. City of Imperial Beach* (1989) 209 Cal.App.3d 349, 355–356 [257 Cal.Rptr. 356].) Colliding with another boat, sinking, falling overboard, and wave movement are objectively foreseeable risks of boating, even if the craft is stationary. Whether or not the victims themselves could foresee the injury is immaterial. (*Perez v. City of Los Angeles* (1994) 27 Cal.App.4th 1380, 1387 [33 Cal.Rptr.2d 55] (*Perez*) ["in determining whether a public entity is entitled to statutory immunity, a plaintiff's knowledge of any particular risks is irrelevant[;] … rules of statutory interpretation … require the application of an objective standard"].)

■ In addition to finding that many of the risks inherent in boating are present when the craft is stationary, we find that the term "boating" in section

831.7 is designed to cover many types of craft. For example, if the plaintiffs were in a rowboat, sailboat, or powerboat, a court could easily find they were boating for the purposes of section 831.7 because the activity contains the word "boat." But activities such as canoeing, which do not specifically contain the word "boat," are included because the craft involved falls under the definition of "boat," the activity involved falls under the definition of "boating," and the risks inherent in the activity are essentially the same. It would be absurd to allow plaintiffs in a canoe to recover, but to deny recovery to plaintiffs in a rowboat.

It is true that the term "boating," compared to the other related terms listed in section 831.7—"kayaking" and "white water rafting"—is a more general term. ▉ It is also true that, *generally*, the more specific terms in a statute limit the more general terms. (Civ. Code, § 3534 ["Particular expressions qualify those which are general"].) If, however, the general and specific terms have independent purposes, then this general rule does not apply. (*Cal. State Employees' Assn. v. Regents of University of California* (1968) 267 Cal.App.2d 667, 670 [73 Cal.Rptr. 449] ["Where general and specific words or phrases have independent purposes and are not used merely to color one another, the rule should not be used to defeat the apparent purpose of the statute"].) As we explain, the general term "boating" in section 831.7 has an independent purpose.

The legislative history of section 831.7 discloses that the purpose of listing the more specific hazardous recreational activities is not to limit the interpretation of the more general activities, but to lend weight in litigation to a public entity's defense. In amending the statute in 1995 to add "mountain biking" and "paragliding" as hazardous recreational activities, the Legislature noted that "the fact that a *specific* activity is listed *lends weight* to a public entity's defense that a claimant injured in a specific activity is engaged in a 'hazardous recreational activity' " even though "the list of hazardous activities in existing law is nonexclusive." (Assem. Com. on Judiciary, 3d reading analysis of Assem. Bill No. 700 (1995–1996 Reg. Sess.) as amended Apr. 26, 1995, p. 2, italics added.) Section 831.7 does not provide a laundry list of specific types of boats because to do so would render the term "boating" meaningless.

In section 831.7, the Legislature explicitly limited two other hazardous recreational activities—vehicle racing and mountain biking—to only activities that are motorized or involve a particular type of movement. Vehicle racing encompasses only "motorized vehicle racing"; and mountain biking explicitly excludes "riding a bicycle on paved pathways, roadways, or sidewalks." (§ 831.7, subd. (b)(3).) If the Legislature had wanted to limit "boating" to only craft that are motorized or move in a particular way, it

could have done so by explicitly listing "boating" as "motorized boating." The Legislature did not do so, even though motorized boats exist. This supports an interpretation that the term "boating" includes slow-moving and floating craft. Furthermore, it would be unreasonable to infer a "motorized" limit to the term "boating" because the risks inherent in boating, as we have seen, apply similarly to motorized and nonmotorized boating.

Finally, the collision that occurred here was a hazard that arose out of sitting in the canoe on the water where power boating with water-skiing was taking place. The legislative history of section 831.7 contemplated an accident similar to the one that took place here, and concluded that the immunity would apply, stating that under section 831.7, "a boater who was capsized by an errant waterskier would not be able to sue the public entity for not establishing proper boating and [water-skiing] areas." (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 555 (1983–1984 Reg. Sess.) as amended May 27, 1983, p. 6.)

We conclude that the term "boating," as used in section 831.7, includes fishing from a canoe tethered near the shore of a waterway which is also being used by powerboats. Thus, the public entities are immune from suit for the injuries that resulted from the decedents' participation in the hazardous recreational activity of "boating" unless the plaintiffs can allege that one of the exceptions to immunity provided in section 831.7 applies. Two exceptions are at issue: failure to warn, and gross negligence. We turn to those now.

3. *Failure To Warn Exception*

The complaint alleges that the public entities failed to warn of the danger. A public entity loses its immunity under section 831.7 if it fails to warn of a particular kind of danger. Section 831.7, subdivision (c)(1), sets forth this immunity exception. It provides:

"(c) Notwithstanding the [immunity] provisions of subdivision (a), this section does not limit liability which would otherwise exist for any of the following:

"(1) Failure of the public entity or employee to guard or warn of a known dangerous condition or of another hazardous recreational activity known to the public entity or employee that is not reasonably assumed by the participant as inherently a part of the hazardous recreational activity out of which the damage or injury arose."

The question is whether a collision with a powerboat could be reasonably assumed to be an inherent risk of the decedents' outing in the canoe. As we

have already discussed, a collision with another boat is an inherent risk of boating. Whether or not the decedents were subjectively aware of such risk is immaterial. (See *DeVito v. State of California* (1988) 202 Cal.App.3d 264, 271–272 [248 Cal.Rptr. 330] (*DeVito*); see also *Perez, supra,* 27 Cal.App.4th at p. 1387.) Furthermore, plaintiffs describe the busy conditions on the waterway—for example, "said channel was *regularly used* by waterskiers and wake boarders in violation of [a speed] regulation," and "the driver of the [colliding] motorboat was performing a loop through the channel and around an island in a pattern *routinely used* by ski boats"—in such a way that the decedents, or any participant in their position, reasonably had to assume the risks posed by the passing motorboats. (Italics added.) Therefore, we find that the public entities were under no duty to warn of these dangerous conditions or these other hazardous recreational activities at the site of the accident because the risks of those conditions and activities were so obvious or inherent that they had to have been reasonably assumed. (*DeVito, supra,* 202 Cal.App.3d at pp. 271–272.)

### 4. *Gross Negligence Exception*

The complaint alleges that the public entities were grossly negligent in failing to alleviate the danger. Section 831.7, subdivision (c)(5), states that the section 831.7 immunity does not apply to "[a]n act of gross negligence by a public entity or a public employee which is the proximate cause of the injury." Gross negligence is defined as " 'the want of even scant care or an extreme departure from the ordinary standard of conduct.' " (*Franz v. Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 138 [181 Cal.Rptr. 732, 642 P.2d 792]; *DeVito, supra,* 202 Cal.App.3d at p. 272.) In the proper context, the gross negligence exception may be considered on demurrer. (See *DeVito, supra,* 202 Cal.App.3d at pp. 268, 272.)

The complaint alleges or can be amended to allege that the public entities were grossly negligent in failing to take adequate safety measures despite complaints of similar accidents for over 25 years and despite knowledge that the channel where the accident occurred was dangerously narrow for speeding watercraft.

Preliminarily, however, another immunity is at play here which limits, as a matter of law, the scope of this alleged gross negligence. The gross negligence can involve only the alleged boat docks, swim platforms and speeding watercraft at the site of the accident. ▮ This is because public entities are immune from liability for injuries caused by natural conditions of unimproved public property, including but not limited to any natural condition of any lake, stream, bay, river, or beach. (§ 831.2; *Osgood v. County of Shasta* (1975) 50 Cal.App.3d 586, 587–588, 590–591 [123 Cal.Rptr. 442]

(*Osgood*) [in a case involving a water-skier who was struck and killed by a motorboat on Shasta Lake, the Court of Appeal found that the shoreline of a man-made lake, with its coves and inlets that allegedly impaired the motorboat's visibility, constituted a dangerous natural condition for the purposes of the section 831.2 immunity; the court affirmed a demurrer in favor of the public entity on this basis].) This natural condition immunity would defeat liability for plaintiffs' allegations that the waterway was dangerous because it had blind curves, corners and vegetation that impeded visibility, and also had narrow channels (to the extent those channels were unimproved).

Turning to plaintiffs' specific allegations of gross negligence, plaintiffs contend the public entities (1) failed to take any safety measures despite decades of studies and complaints showing the danger, (2) failed to provide "a few extra patrols," and (3) failed to post five m.p.h. speed limit signs or place five m.p.h. buoys or erect a barrier to prevent motorboats from speeding past the boat docks and swim platforms. We consider these three contentions in turn.

First, to the extent that the allegations concerning the failure to take any safety measures encompass the adoption or the failure to adopt local ordinances or something similar, those allegations do not provide a basis for gross negligence liability. This is because section 818.2 states in part that a "public entity is not liable for an injury caused by adopting or failing to adopt an enactment ...." This immunity is necessary to protect the essential governmental function of making laws, so that the judiciary does not question the wisdom of every legislative decision through tort litigation. (4 Cal. Law Revision Com. Rep. (1963) 801, 817.)

Second, the alleged failure to provide a few extra patrols furnishes no basis for gross negligence liability. This is because section 845 provides that "[n]either a public entity nor a public employee is liable for failure ... to provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service."

That leaves plaintiffs' third basis of alleged gross negligence: the alleged failure to post speed limit signs, place buoys or erect barriers. These allegations relate to Harbors and Navigation Code section 655.2, which specifies a five m.p.h. speed limit for boats within 200 feet of a boat dock or a swim platform. (Harb. & Nav. Code, § 655.2, subd. (a)(2)(B), (C).) If granted leave to amend, plaintiffs would allege that the public entities were grossly negligent in that "the narrow channel where the incident occurred was no more than 100 feet wide and was lined on one side by swimming platforms and docks to which boats were moored, that under

applicable regulations a boat cannot be operated in excess of 5 miles per hour within a distance of 200 feet from such a platform or dock (Harb[.] & Nav[.] Code[,] § 655.2), that it was impossible for boats speeding through the subject channel to comply with this boating law, that the incident occurred less than 50 feet from the aforementioned dock[s] and swimming platform[s], [and] that for 30 years or more [the public entities] knew boats routinely violated said laws by speeding through the subject channel ...." Plaintiffs claim the public entities should have placed a five m.p.h. sign or buoy at either end of the channel or a barrier to prevent powerboats from violating the speed law near the boat docks and swim platforms.

 The failure to post five m.p.h. speed limit signs or place five m.p.h. buoys, or to erect a barrier to prevent motorboats from speeding past the boat docks and swim platforms, we conclude, is the equivalent of failing to enforce Harbors and Navigation Code section 655.2. Section 655.2 specifies a five m.p.h. speed limit in the area of boat docks and swim platforms.

Posting signs, placing buoys, or erecting barriers are all methods the public entities could use to "enforce" the speed law set forth in Harbors and Navigation Code section 655.2. " 'To enforce' a law usually means to cause the arrest and to coerce by 'actual force and punishment,' but it does not necessarily imply this; it may mean 'to give effect to, to cause to have force.' " (*Meridian, Ltd. v. Sippy* (1942) 54 Cal.App.2d 214, 220 [128 P.2d 884], citing *Widener v. Sharp* (1923) 109 Neb. 766 [192 N.W. 726] [in *Meridian*, a state law required a permit to sell milk; if the state permittee sold milk in a city having "higher standards" by local ordinance, the permittee had to comply with these standards; in this way, the state "enforced" the local ordinances by giving force or effect to them even though the coercion and force to be applied to violators remained with the city]; *Heidt v. Miller Heating & Air Conditioning Co.* (1969) 271 Cal.App.2d 135, 137 [74 Cal.Rptr. 695] [agreeing with *Meridian* that "[t]o enforce may mean to give effect to or to cause to have force"].) Placing speed limit signs or buoys, or erecting a barrier, has the effect of notifying boaters that they are entering a five m.p.h. zone. While the buoys and signs would not "compel" obedience to this law the way an arrest would, they would visually signal to boaters that the law operates in that area. Therefore, these actions would "give effect to" Harbors and Navigation Code section 655.2 and cause the section "to have force."

Once it is determined that failing to place speed limit signs or buoys, or failing to erect a barrier, is the equivalent here of failing to enforce the speed limit law of Harbors and Navigation Code section 655.2, section 818.2 operates to extinguish any basis for gross negligence liability in this regard. Section 818.2 in part immunizes a public entity from liability "for an injury caused by ... failing to enforce any law."

Case law supports this conclusion. In *Sutton v. Golden Gate Bridge, Highway & Transportation Dist.* (1998) 68 Cal.App.4th 1149 [81 Cal.Rptr.2d 155], the Court of Appeal concluded that a bridge district that maintained the Golden Gate Bridge was immune under section 818.2 for alleged negligence in failing to enforce the bridge speed limit; that enforcement failure apparently included a failure to provide enough speed restriction signs. (*Sutton,* at pp. 1153–1154, 1164–1165.)

One may be tempted to argue that section 815.6, a companion provision to section 818.2, provides a basis for gross negligence liability here. (See *Osgood, supra,* 50 Cal.App.3d at pp. 590–591 [where a plaintiff, stymied by an immunity, attempted to establish independent liability under § 815.6]; see 4 Cal. Law Revision Com. Rep., *supra,* at p. 841.) That argument would be misguided. Section 815.6 provides: "Where a public entity is under a *mandatory duty* imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." (Italics added.) Section 663 of the Harbors and Navigation Code states that peace officers "shall enforce" the statutory chapter that includes the five m.p.h. speed limit specified in section 655.2.

▬ Despite the apparent mandate that peace officers "shall enforce" this five m.p.h. speed limit, Harbors and Navigation Code section 663 does not impose upon public entities a mandatory duty within the meaning of section 815.6. As the Law Revision Commission Report stated in its recommendation to enact section 815.6, that section merely "declares the familiar rule, applicable to both public entities and private persons, that *failure to comply with applicable statutory or regulatory standards* is negligence unless reasonable diligence has been exercised *in an effort to comply with those standards.*" (4 Cal. Law Revision Com. Rep., *supra,* at p. 840, italics added.) Thus, section 815.6 applies when a public entity, in its own conduct or pursuant to its charge, *must itself comply* with a particular minimum standard of safety or performance; for example, the statutory duty to provide lifeguard service at public swimming pools. (4 Cal. Law Revision Com. Rep., *supra,* at p. 816.) The enforcement requirement of Harbors and Navigation Code section 663 does not specify a "mandatory duty" within the meaning of section 815.6 because section 663 does not specify that a public entity *must itself comply* with the five m.p.h. speed limit. Rather, the public entity is *to enforce* that speed limit. (See *Osgood, supra,* 50 Cal.App.3d at p. 590 [plaintiffs in a collision case involving a water-skier and a boat did "not state a cause of action under Government Code section 815.6 (failure to perform a mandatory duty, i.e., enforcement of safety laws, etc.) because they point[ed] to no *duty imposed upon* [the public entity] by any enactment", italics added]; *Elton v. County of Orange* (1970) 3 Cal.App.3d 1053, 1056, 1059

[84 Cal.Rptr. 27] [suit against a county under § 815.6 upheld because it rested on the county's *own failure to comply* with mandatory state standards of foster home inspection and supervision rather than on discretionary licensing activities]; see also 4 Cal. Law Revision Com. Rep., *supra,* at p. 816 [characterizing scope of § 815.6]; see also *Morris v. County of Marin* (1977) 18 Cal.3d 901, 906–908, 914–916 [136 Cal.Rptr. 251, 559 P.2d 606]; *Elson v. Public Utilities Commission* (1975) 51 Cal.App.3d 577, 589 [124 Cal.Rptr. 305].)

Our conclusion to apply the section 818.2 immunity for "failing to enforce any law" to the alleged failures to place five m.p.h. speed limit signs or buoys, or a barrier, also serves public policy. As the California Law Revision Commission stated in its recommendation to enact section 818.2, "[a]n essential function of government is the ... enforcing of laws ....

"[P]ublic entities and their employees should not be liable for inadequate enforcement of any law or regulation or for failure to take steps to regulate the conduct of others. The extent and quality of governmental service to be furnished is a basic governmental policy decision ....

"[D]iscretionary decisions in these areas cannot be subject to review in tort suits for damages if government is to govern effectively.

"[I]f liability existed for this type of activity, the risk exposure to which a public entity would be subject would include virtually all activities going on within the community. There would be potential governmental liability for all building defects, for all crimes, and for all outbreaks of contagious disease .... The Commission believes that it is better public policy to leave the injured person to his remedy against the person actually causing the injury than it is to impose an additional liability on the government for negligently failing to prevent the injury." (4 Cal. Law Revision Com. Rep., *supra,* at pp. 817–818.)

One question remains. Can plaintiffs allege a type of barrier that has a function other than simply enforcing the five m.p.h. speed limit? We think not. Based on the facts alleged, the channel where the accident occurred has boat docks. Using a barrier to prohibit all boat traffic in the channel would deprive boats moored at the docks of access to the rest of the waterways. The record does not show plaintiffs are suggesting that solution. Based on plaintiffs' allegations, then, any barrier would have to allow boats access to the channel, and the barrier's only purpose would be to regulate the speed of the boats in the channel.

We conclude the gross negligence exception to the hazardous recreational immunity of section 831.7 does not apply here as a matter of law.

Finally, plaintiffs rely on *Swaner v. City of Santa Monica* (1984) 150 Cal.App.3d 789 [198 Cal.Rptr. 208]. That case is distinguishable. In *Swaner*, the plaintiffs were sleeping on a public beach when they were struck by a van that was on the beach illegally. The plaintiffs sued the city and the state, alleging that the lack of a barrier between the beach and an adjacent parking lot that provided access to the beach constituted a dangerous condition. In reversing demurrers in favor of the city and the state, the *Swaner* court found that the plaintiffs could make this allegation because a condition of public property that increases the risk of injury from third party conduct may be a "dangerous condition." (*Swaner, supra,* 150 Cal.App.3d at pp. 806–808; see *Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139 [132 Cal.Rptr.2d 341, 65 P.3d 807]; *Zelig, supra,* 27 Cal.4th at p. 1137.) Here, by contrast, we have accepted plaintiffs' allegations of a dangerous condition. We have found, however, an overriding immunity to liability for this condition—the section 831.7 immunity for hazardous recreational activity. *Swaner* involved mainly the question of whether a dangerous condition existed, and did not turn on an overriding immunity. (*Swaner, supra,* 150 Cal.App.3d at pp. 811–814.)

## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs on appeal.

Raye, J., and Hull, J., concurred.

On September 5, 2003, the opinion was modified to read as printed above.